Drianne BENNER et al., Plaintiffs,

v.

John W. OSWALD, President of the Pennsylvania State University, et al., Defendants.

Civ. No. 77–351.

United States District Court, M. D. Pennsylvania.

Jan. 24, 1978.

As Corrected March 20, 1978.

546

Thomas B. Schmidt, III, Harrisburg, Pa., Alan B. Morrison, Washington, D. C., for plaintiffs.

Delbert J. McQuaide, McQuaide, Blasko & Brown, Inc., State College, Pa., for Penn State defendants.

Melvin H. Evans, Jr., J. Justin Blewitt, Jr., Deputy Attys. Gen., Harrisburg, Pa., for Shapp, Shelhamer, Kline, Goddard.

## OPINION

MUIR, District Judge.

### I. Introduction.

Drianne Benner and three other undergraduate students at the Pennsylvania State University (Penn State) have filed this action pursuant to 42 U.S.C. § 1983 alleging that the method of selection of the members of the Board of Trustees of Penn State which does not permit undergraduate students to elect representatives to the Board of Trustees violates their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. On December 6, 1977, all Defendants except Defendants Shapp, Shelhamer, Kline, and Goddard filed a motion for summary judgment accompanied by a brief. On December 15, 1977, the remaining Defendants joined in the motion. On December 20, 1977, Plaintiffs filed a cross-motion for summary judgment accompanied by a brief in support of their motion and in opposition to the Defendants' motion. On December 23, 1977, Defendants filed a reply brief. On January 3, 1978, the case was submitted to the Court on the basis of a case stated with all parties electing to rely upon the briefs already submitted. The Court deems this submission of the issues on a case stated basis to constitute withdrawal of the motions for summary judgment. The following are the Court's findings of fact, discussion, and conclusions of law.

### II. Findings of Fact.

1. Plaintiffs are four undergraduate students enrolled in various courses of study at The Pennsylvania State University. (U)

2. James Scarantino is twenty-one years old and an undergraduate student at the University, in the College of Liberal Arts. He entered the University in 1974, and expects to graduate in 1978 with the degree of Bachelor of Arts. His major fields of study are political science and economics. Plaintiff Scarantino has taken an active interest in the affairs of the University. He was Coordinator of Students for PennPIRG, and was elected Undergraduate Student Government Senator in 1976. He is chairman of the Organization for Town Independent Students and former chairperson of that organization's ad hoc Housing Study Committee. He is a member of Omicron Delta Kappa and Skull and Bones Honor Societies. He is also a registered voter in Centre County, Pennsylvania. (U)

3. Ann Ziminski is twenty-one years of age. She entered the University in 1974, and expects to graduate with the degree of Bachelor of Science in the College of Agriculture in 1978. Her major field of study is Environmental Resources Management. She was the President of Eco-Action and a member of the Free University, both of which are University student organizations. She is a registered voter in Centre County, Pennsylvania. (U)

4. Jeffrey Glazier is twenty years of age. He entered the University in 1975, and expects to graduate with the degree of Bachelor of Arts in the College of Liberal Arts in 1979. His major field of study is Labor Studies. He is a resident of University student housing and Vice President of the Association of Residence Hall Students, an organization of approximately 10,000 student members at the University. He was a member of the Student Litigation Organization and is a member of East Halls Radio, both of which are University student organizations. He is a registered voter in Lehigh County, Pennsylvania. (U)

5. Drianne Benner is twenty-one years of age. She entered the University in 1974, and expects to graduate with the degree of Bachelor of Arts in the College of Liberal Arts in 1978. Her major field of study is Political Science and History. She was an active member of Students for PennPIRG, a University student organization. She is a registered voter in Centre County, Pennsylvania. (U)

6. The Plaintiffs would like to participate in the election of trustees of the University and do not believe it is proper that others whom Plaintiffs believe have little or no relationship to the University, can par-

ticipate in the election process while they have no such right. They are committed to working to change the election process and to that end intend to pursue this action vigorously. (U)

7. The Defendants are 32 persons who, at the time of the initiation of this action, comprised the Board of Trustees of The Pennsylvania State University. (U)

8. Defendants Milton J. Shapp, Kent Shelhamer, Caryl Kline and Maurice K. Goddard are ex-officio members because of their status as Governor, Secretary of Education, Secretary of Agriculture, and Secretary of Environmental Resources, respectfully. (U)

9. Defendants Harry Boyer, Helen Davies, Joseph Rhodes, Jr., Robert L. Ruttenberg, Dion C. Stewart and William K. Ulerich have been appointed to the Board by the Governor. (U)

10. Defendants H. Jesse Arnelle, Marian U. Barash, Walter J. Conti, Barbara H. Franklin, Ralph Hetzel, Kenneth L. Holderman, Charles W. Schaeffer and Helen Wise are the members of the Board representing the alumni. (U)

11. Defendants J. Lin Huber, John M. Phillips, John R. Pitzer, Jr., Luther Snyder, Harry R. Ulrich and J. Lewis Williams were selected as Board members by delegates representing county agricultural societies. (U)

12. Defendants H. Thomas Hallowell, Jr., Samuel F. Hinkle, John L. Romig, Stanley G. Shaffer, G. Albert Shoemaker and Quentin E. Wood were selected as Board members by delegates representing county engineering, mining and manufacturing societies. (U)

13. Defendant Oswald is an ex-officio member of the Board as the President of The Pennsylvania State University. (U)

14. These trustees were all selected in accordance with provisions of the corporate charter of the University. (U)

15. The Pennsylvania State University was incorporated by an Act of the Legislature of the Commonwealth of Pennsylvania in 1855. Act of February 22, 1855, P.L. 46. (U)

16. On March 13, 1867, the Board of Trustees of the University accepted the benefits of the Morrill Act as designated by the Legislature of the Commonwealth of Pennsylvania. Submitted herewith as Exhibit D26 is a certified copy of the relevant portion of the minutes of that meeting of the Board. (U)

17. On August 28, 1878, the Executive Committee of the Board of Trustees accepted the provisions of the Constitution of the Commonwealth of Pennsylvania of 1874. Submitted herewith as Exhibit D25 is a certified copy of the relevant portion of the minutes of that meeting of the Board. (U)

18. There have been numerous amendments to the charter changing the number of trustees and the manner of their selection. These amendments have been adopted by the Board of Trustees and approved by the Court of Common Pleas of Centre County. (Exhibits 35 through 45). These amendments were made by the Board of Trustees in conformance with the applicable corporate law in effect from time to time. (U)

19. The present charter provides that the Board shall consist of five ex-officio members (the Governor, Secretary of Education, Secretary of Agriculture, Secretary of Environmental Resources, and the President of the University); six members appointed by the Governor, nine members selected by the General Alumni Association; six members selected by delegates representing county agricultural societies in the Commonwealth; and six members selected by delegates representing county engineering, mining, manufacturing and mechanical societies. (U)

20. The authority, duties and functions of the Board of Trustees of the University, as well as the duties of the President and other officers of the Board, are set forth in the following documents: (a) the Corporate Charter (a true copy of which is submitted herewith as Exhibit D1); (b) the Corporate Bylaws (a true copy of which is submitted herewith as Exhibit D2); and (c) the Stand-

ing Order of the Board, adopted on June 11, 1970, as amended on November 19, 1971 and May 30, 1975, (a true copy of which is submitted herewith as Exhibit D3). (U)

21. The President's duties as Secretary of the Board are set forth in Article 2, Section (4) of the Bylaws (Exhibit D2). He is custodian of the corporate seal; he conducts the ordinary correspondence of the Board; and he maintains an accurate record of all proceedings of the Board. (U)

22. The current Bylaws of the Board (Exhibit D2) were adopted by resolution of the Board on November 13, 1970. (U)

23. Both the deliberations of the Board and the adoption of the Bylaws occurred without the participation of either the executive or legislative branches of state government, except to the extent that the state government ex-officio members and the gubernatorial appointees participated as members of the Board of Trustees. (U)

24. The Governor of the Commonwealth does not attend the meetings of the Board. The present Governor has designated a personal representative to attend meetings as a non-voting observer. (U)

25. In connection with the adoption of the Bylaws, there was no direction or recommendation emanating from the Governor, the Pennsylvania Department of Education, the State Board of Education or any other department of the executive branch, or from the legislative branch, of the Commonwealth of Pennsylvania. (U)

26. The Bylaws provide for the organization and meetings of the Board, the duties of the officers of the Board, the functions of the committees of the Board and other miscellaneous matters. (U)

27. The activities of the Board, and of the officers of the Board, and of the committees of the Board, conducted pursuant to the Bylaws, occur without participation by either the executive or legislative branches of state government, except to the extent that the state government ex-officio members and the gubernatorial appointees participate as members of the Board of Trustees. (U)

28. In connection with the activities and functions provided for in the Bylaws, there is no direction to the Board from the Governor, the Pennsylvania Department of Education, the State Board of Education or any other department of the executive branch, or from the legislative branch, of the Commonwealth of Pennsylvania. (U)

29. The Bylaws make no provision for the participation of executive or legislative branches of the Commonwealth in the activities and functions controlled by the Bylaws. (U)

30. The duties of the President of the University have been established by the Board of Trustees by Standing Order of the Board, (Exhibit D3). (U)

31. The Standing Order of the Board (Exhibit D3) adopted June 11, 1970, provides for the governance of the University. (U)

32. Both the deliberations and the adoption of the Standing Order occurred without the participation of either the executive or legislative branches of state government, except to the extent that the state government ex-officio members and the gubernatorial appointees may have participated as members of the Board of Trustees. (U)

33. The functions of the Board of Trustees, the President of the University, the faculty, the students and the University Council provided for in the Standing Order occur without the participation of either the executive or legislative branches of state government. (U)

34. There has been no direction or recommendation to the Board, to the President, to the faculty, to the students or to the University Council from the executive or legislative branches of the Commonwealth with respect to the governance of the University. (U)

35. The Standing Order makes no provision for the participation of executive or legislative branches of the Commonwealth in the activities and functions controlled by the Standing Order. (U)

36. The University's commitment under its designation as the land grant institution of the Commonwealth is to be an institution where the leading object is, without excluding other studies, to teach such branches of learning as are related to agriculture and the mechanic arts. (U)

37. Pursuant to the commitment made by the Act of April 1, 1863, P.L. 213, 24 P.S. § 2571 et seq., the Commonwealth of Pennsylvania provides for an annual appropriation to the University. (U)

38. In the last five fiscal years the amounts appropriated, and the percentage of total revenues these amounts represent, have been as follows:

|  | 1971–72 | 1972–73 | 1973–74 |
| --- | --- | --- | --- |
| Amount Appropriated | 76,200,000 | 82,694,000 | 87,106,895 |
| % of Total Revenues | 34.9% | 33.8% | 33.5% |

|  | 1974–75 | 1975–76 |  |
| --- | --- | --- | --- |
| Amount Appropriated | 94,087,520 | 102,685,610 |  |
| % of Total Revenues | 32.4% | 31.2% | (U) |

39. The state appropriation is a so-called "non-preferred" appropriation which requires a two-thirds vote of the Legislature and which is made only after the state government budget is enacted and funded. (U)

40. The Commonwealth of Pennsylvania has made grants for special projects during the past five years in the following amounts:

|  | 1971–72 | 1972–73 | 1973–74 |
| --- | --- | --- | --- |
| Amount of Contracts | 3,438,104 | 4,290,354 | 4,923,934 |
| % of Total Revenues | 1.6% | 1.8% | 1.9% |

|  | 1974–75 | 1975–76 |  |
| --- | --- | --- | --- |
| Amount of Contracts | 6,185,832 | 6,291,555 |  |
| % of Total Revenues | 2.1% | 1.9% | (U) |

41. Students at The Pennsylvania State University have received scholarships from the Pennsylvania Higher Education Assistance Agency in the following amounts for the past five years:

|  | 1971–72 | 1972–73 | 1973–74 |
| --- | --- | --- | --- |
| Total Scholarships | 6,621,371 | 7,475,077 | 8,139,215 |
| % of Tuition | 14.5% | 14.8% | 15.3% |

|  | 1974–75 | 1975–76 |  |
| --- | --- | --- | --- |
| Total Scholarships | 9,517,385 | 9,042,161 |  |
| % of Tuition | 16.1% | 13.3% | (U) |

42. For fiscal year July 1, 1977 through June 30, 1978, the Legislature was nearly six months late in providing an appropriation to the University because funds were not available; consequently, the University borrowed funds in its own name in order to continue operating. The Commonwealth of Pennsylvania is not obliged to repay the borrowed funds. (U)

43. Submitted herewith as Exhibits D4 through D12 are the annual appropriation acts for the years 1970, 1971, 1972, 1973, 1974, 1975 and 1976. (U)

44. The General State Authority has provided physical facilities to the University for many years. Since 1968 the General State Authority has constructed on the campuses of the University educational buildings valued at approximately 95 million dollars. (U)

45. The General State Authority improvements were made pursuant to the General State Authority Act of 1949, as amended, 1949, March 31, P.L. 372, § 4, 71 P.S. 1707.4, which provides:

"The Authority is created for the purpose of constructing * * * additions and improvements to land grant colleges, the University of Pittsburgh and Temple University * * *." (U)

46. Legal title to the buildings and the land upon which buildings are constructed by the GSA are situate is in the General State Authority. In every instance, the University has conveyed fee simple title to the land by general warranty deed. (U)

47. The University utilizes the GSA buildings in its educational functions and for no other purpose.

48. The employees of the University may be members of the State Employes' Retirement System. 71 Pa.C.S. § 5101 et seq. (U)

49. The University pays its employer's contribution into the State Employes' Retirement System fund from its general operating revenues. (U)

50. Roads on the campuses of the University may be constructed by the Pennsylvania Department of Transportation, 36 P.S. § 670–601. (U)

51. The University has had the ability to issue tax exempt bonds and has done so in the past. (U)

52. The University owns approximately 15,874 acres of land, with its total property holdings valued at approximately $641,000,-000. (U)

53. For the Fall Term of 1976, excluding continuing education enrollments, there were 42,741 students enrolled as undergraduate degree candidates and 6,031 students enrolled as graduate and medical degree candidates. There were 4,591 students enrolled in non-degree programs. (U)

54. The University employs approximately 11,500 persons on a full time basis. (U)

55. In December and January of each year, the University sends to each county agricultural extension director the list of agricultural societies which were eligible to send delegates to the selection of agricultural trustees, during the previous commencement week. (U)

56. Each county agricultural extension director determines whether the agricultural societies for their respective counties are in existence and also determines whether there are new agricultural societies to be added to the list of those eligible to send delegates. (U)

57. Exhibit 32 is a list of the 397 agricultural societies eligible to send delegates. (U)

58. The Secretary of Agriculture of the Commonwealth also receives a copy of the list for review, and returns to the University the Department of Agriculture's most recent booklet containing names and addresses of agricultural organizations and fair associations. (U)

59. In December and January of each year, the University sends the list of industrial societies and associations which were eligible to send delegates to select industrial trustees during the previous commencement week to the Secretary of Environmental Resources, the Executive Secretary of the Pennsylvania Society of Professional Engineers, the Secretary of the Pennsylvania Manufacturers' Association, and the Assistant Deans for Continuing Education in the Colleges of Engineering and Earth and Mineral Sciences. (U)

60. The list is reviewed to determine whether the industrial organizations listed are in existence and also whether there are new industrial organizations to be added to the list which are eligible to send delegates. (U)

61. Exhibit 33 is a list of the 160 mining, manufacturing and engineering societies eligible to send delegates. (U)

62. After the lists of agricultural and industrial societies have been returned to the University in February, a letter is sent in March to the secretaries of each organization on the lists (Exhibit D13), inviting the organization to participate in the election under the provisions of the charter of the University. A card is enclosed which is to be returned to the University, signed by the secretary of the society, giving the names of the delegate or delegates authorized to represent that organization (Exhibit D14). Three credential cards (Exhibit D15) are also enclosed with the letter (Exhibit D13) to be signed by the association secretary and provided to the delegates for presentation at the registration desk on the day of election. The University then informs each delegate by letter of the time and place of the election (Exhibit D16). (U)

63. Approximately 450 delegates participate annually. In 1977, there were 207 delegates representing agricultural societies, and 198 delegates representing industrial societies. (U)

64. Each delegate is required to sign a registration card on the day of the election (Exhibit D17). At the time of registration for the election, each delegate receives a copy of instructions for the election procedure (Exhibit D18). (U)

65. Candidates for the election are nominated by the delegates at the time of the election. If not more than two candidates for election are nominated, the election is by acclamation and the secretary is instructed to cast a unanimous ballot for the two candidates. (U)

66. In the event of a contested election, all the delegates of each county receive not more than three ballots to be used in the election (Exhibit D19). The two candidates receiving the highest number of votes are elected. (U)

67. In 1977, there were four candidates for the two trustee positions to be elected by the delegates of the agricultural societies. (U)

68. In 1970 there were three candidates for the two trustee positions to be elected by the delegates of the agricultural societies and three candidates for the two trustee positions to be elected by the delegates of the industrial societies. (U)

69. In all other elections since 1970, there has been no contest. (U)

70. J. Lewis Williams is a farmer and has owned and operated a large dairy farm near Uniontown, Fayette County, Pennsylvania for 27 years. He is a member of the Board of Trustees of The Pennsylvania State University, having been first elected to the Board of Trustees by the organized agricultural societies and associations of Pennsylvania in 1955 and having served continuously thereafter, being reelected in 1958, 1961, 1964, 1967, 1970, 1973 and 1976. He is currently Vice Chairman of the Board of Trustees. (U)

71. J. Lewis Williams is a member of the Fayette County Agricultural Improvement Association of Fayette County and consequently eligible to serve on the Board of Trustees. (U)

72. The Fayette County Agricultural Improvement Association of Fayette County is a private organization, with the purposes of supporting agriculture in the County and conducting the County Fair. Submitted herewith as Exhibit D28 are the Articles of Incorporation of the Association. (U)

73. The election of agricultural trustees occurs as follows. Upon receipt of notice of the election from the University, each society or association meets to decide upon delegates and candidates. With respect to delegate selection, the manner of selection is informal. Members of the society or association may volunteer to be delegates or they may be appointed or elected. The credential cards are given by the secretary of the society or association to the persons selected to be the delegates. Although the practice varies, some societies or associations pay the mileage expense of the delegates for travel to the election. (U)

74. With respect to the selection of candidates, the society or association generally instructs the delegates to vote for two particular individuals. (U)

75. The society or association will be aware of the names and background of the candidates because of the endorsements of certain state-wide farm organizations. The leadership of the Pennsylvania State Grange, a private voluntary organization of persons interested in agricultural pursuits, normally endorses candidates and either formally or informally informs the Pomona Granges, which are organized on a county basis, of its endorsements. The leadership of the Pennsylvania Farmers Association, a private voluntary organization of persons interested in agricultural pursuits, also normally endorses candidates and either formally or informally informs its county chapters of its endorsements. Finally, the Pennsylvania State Council of Farm Organizations endorses candidates. This Council is composed of persons from various state-wide farm organizations. Endorsement requires a unanimous vote of approval by the executive committee of the Council. (U)

76. The societies and associations may also receive communications from the candidates and may receive information concerning a candidate from a County Agricultural Extension Office of the University. (U)

77. The executive and legislative branches of the Commonwealth of Pennsylvania do not participate in the elections of trustees by the delegates or the organized agricultural societies of Pennsylvania, and do not attempt to influence or make recommendations with respect to such elections. (U).

78. The election of trustees by the engineering, mining, manufacturing and mechanical societies and associations is conducted largely through and under the auspices of the Pennsylvania Manufacturers' Association (hereinafter called PMA). (U)

79. The PMA was organized in 1909 as a nonprofit, unincorporated association having as its purpose the promotion of "the welfare of its members and the economic prosperity of the Commonwealth of Pennsylvania and its manufacturing and service industries." Submitted herewith as Exhibit D29 are the Articles of Agreement of PMA. (U)

80. The PMA is a broadbased organization with over five thousand (5000) dues paying members, comprised of individual members, organizational members, and trade association members in Pennsylvania. It is governed by a Board of Governors consisting of 24 persons who are elected by the members. The Board of Governors elects a Chairman of the Board, President, Secretary, Treasurer and an Executive Committee composed of five members of the Board of Governors plus the chairman of the Board and the President. (U)

81. Pursuant to Article XI of the Articles of Agreement (Exhibit D29), the PMA has local chapters and appointed secretaries in 41 counties of the 67 in the Commonwealth of Pennsylvania. The local county chapters are governed by the Articles of Agreement (Exhibit D29) and do not have separate articles or bylaws. In addition, PMA maintains liason with autonomous manufacturing associations located in 13 counties. (U)

82. Annually, the Board of Governors and the Executive Committee of the Board of Governors endorses candidates for election to the industrial segment of the Board of Trustees of The Pennsylvania State University. The endorsements are made after interviews of the candidates by the officers of PMA. (U)

83. The candidates endorsed by PMA are members of the industrial community who are interested in the University and willing to take the time to attend Board meetings and otherwise participate responsibly in the activities of the University. (U)

84. The PMA participates in the election of the industrial trustees based upon its system of local chapters, which are present in 41 counties, and based upon its liason with the autonomous manufacturing associations. The administration staff of the PMA selects the delegates to represent its local chapters and the autonomous manufacturing associations, and instructs the delegates to vote for the candidates endorsed by the Board of Governors. (U)

85. A few associations or societies not affiliated with PMA send delegates to the election; however, the majority of delegates represent the PMA and through it, a system of PMA local chapters and the 13 autonomous associations. (U)

86. The executive or legislative branches of the Commonwealth of Pennsylvania do not participate in the elections of trustees by the delegates of the organized engineering, mining, manufacturing and mechanical societies of Pennsylvania, and do not attempt to influence or make recommendations with respect to such elections. (U)

87. During the period 1962 through 1977, inclusive, with only one exception, no trustee who was a gubernatorial appointee or who was an ex-officio member participated as a chairman or election teller of the meetings of the society delegates to elect trustees. The exception was that in 1963, H. Beecher Charmbury, an ex-officio member of the Board by virtue of being Secretary of Mines (now Secretary of Environmental Resources), was an election teller for the balloting to select trustees representing the industrial societies. (U)

88. The organizations which send delegates to elect trustees representing county agricultural and mechanical societies are private entities. (U)

89. With respect to the annual election by the General Alumni Association, Richard E. Grubb is responsible for the administrative procedures for the election. (U)

90. Not later than February 1 of each year nomination ballots are mailed by the University to alumni who have been active members of the Alumni Association or who have contributed to the University within the past two years or who specifically request a nomination ballot. Approximately 50,000 nomination ballots are mailed. All nominees receiving 50 or more votes are eligible for the election if they so consent. (U)

91. There are normally between eight and 12 nominees for three positions. Positions on the election ballot are determined by drawing of lots by the Associate Secretary of the Board in the presence of the nominees or their representatives (Exhibit D21). The Chairman of the Board of Trustees, the President of the University, the Alumni Association and all candidates are notified of the order of names on the ballot. (U)

92. Early in April, the Chairman of the Board appoints two alumni trustees not running for reelection to serve as judges of the election. (U)

93. Election ballots are mailed to the alumni no later than April 15 and must be returned no later than 8:30 a. m., the day of the election. Approximately 14,000 alumni cast their ballots each year. (U)

94. On the election day, the ballots are machine counted under the supervision of the two judges of election. The three candidates receiving the highest number of votes are elected. (U)

95. Submitted herewith as Exhibit D20 is a copy of a document entitled "The Pennsylvania State University, Procedure for Nomination and Election of Trustees by Alumni" which was prepared under the supervision of Richard E. Grubb in November, 1976, and which contains a complete statement of all procedures, as well as copies of all forms which are used in connection with the election. (U)

96. Submitted herewith as Exhibit D22 is a copy of a letter, dated March 11, 1977, from Richard E. Grubb to W. K. Ulerich, President of the Board of Trustees, inform-ing him of the drawing for positions on the ballot for the 1977 alumni election, which letter is representative of the letters sent by Richard E. Grubb in connection with each annual alumni election. (U)

97. Attached hereto as Exhibit D23 is a copy of a letter dated March 17, 1977, from Richard E. Grubb to W. K. Ulerich, President of the Board of Trustees, informing him of his responsibility to appoint judges of the elections and that it is traditional to appoint judges from the trustees previously elected by the same category of electors, which letter is representative of the type of letter sent each year by him in connection with the elections. (U)

98. The executive and legislative branches of the Commonwealth of Pennsylvania do not participate in the election of trustees by the alumni, and do not attempt to influence or make recommendations with respect to such elections. (U)

99. The University offers educational programs related to agricultural and the mechanic arts, as well as other university-level educational programs. Submitted herewith as Exhibit D27 is the University Bulletin for the current academic year, which sets forth the agricultural and mechanic art educational programs of the University at pages 48–71, 104–119 and 149–164. (U)

100. The records of the University contain a document entitled "membership List and Biographical Information, the Board of Trustees, The Pennsylvania State University, July 1, 1977," which contains the names and biographical data for each current trustee of the University. This document is submitted herewith as Exhibit D24. (U)

101. For the period 1953 through 1977, alumni have contributed the sum of $11,247,076 to the University through lifetime gifts or by testamentary bequests. (U)

102. For the period 1970 through June 30, 1977, alumni have contributed the sum of $6,813,409 to the University through lifetime gifts or by testamentary bequests. (U)

103. The Alumni Association of The Pennsylvania State College was originally formed in 1870. It was incorporated as a nonprofit corporation under the laws of the Commonwealth of Pennsylvania on January 26, 1924, and continues in existence as a nonprofit corporation to this date. A true and correct copy of the Articles of Incorporation is submitted herewith as Exhibit D30. (U)

104. One of the purposes of the Association stated in the corporate charter is "to promote the best interests of the Pennsylvania State College." Through programs sponsored or assisted by the Penn State Alumni Association, alumni have participated in numerous activities which promote the interests of the University. The "Alumni Fellows" program, sponsored by the Association and the deans of the various colleges of the University, brings prominent alumni to the University for a three to five day period during which they participate in seminars, attend classes and consult informally with students and faculty. Those chosen as "Alumni Fellows" have distinguished records in their occupations and professions, and serve as a valued source of information and assistance to students and faculty in their respective disciplines. A copy of the 1977 Alumni Fellows Booklet, describing the alumni who participated and some of their activities, is attached hereto as Exhibit D31. (U)

105. The Alumni Council is the 50-member governing body of the Association. The Council reviews matters which are of interest to the continued growth of the University, and offers counsel and support to the Board of Trustees on issues before the Board. It assists in the placing of students in the Internship Program administered by the Placement and Student Aid Offices, whereby qualified students spend one term working in industry to obtain practical experience in their field. It assists the Placement Office in obtaining employment for students following graduation. In addition, the Council has been the source of valuable assistance and information in instances when the Board of Trustees or the administrative officers of the University have made specific requests on a particular matter. (U)

106. Eight colleges of the University have formed informal college alumni associations, comprised of alumni working in fields related to the particular college. Members of these groups return to campus to participate in lectures, seminars and other academic functions. These alumni also attend "career days" sponsored by the colleges, to provide students with an opportunity to obtain information about career opportunities for graduates in those colleges. (U)

107. Annually, the Board of Trustees adopt the operating budget for the University for the fiscal year beginning July 1. (U)

108. In connection with adopting the budget, the Board also determines the level of tuition to be paid by students in the next academic year. The level of tuition is based upon estimates of expense and of income from other sources, including the estimated amount of the state appropriation, endowment income, recovery of indirect costs on government contracts and other miscellaneous sources. (U)

109. For the Fall and Winter academic terms of 1977, the tuition for Pennsylvania residents was $421.00 per term. The tuition for non-residents of Pennsylvania was $881.00 per term. (U)

110. The determination of the level of tuition is made solely by the Board of Trustees without direction by either the executive or legislative branches of the Commonwealth of Pennsylvania. (U)

### III. Discussion.

The Plaintiffs, four undergraduate students at Penn State, allege that the selection of the members of the Board of Trustees is an action taken under color of state law so that 42 U.S.C. § 1983 is applicable, and that permitting Penn State alumni, members of local agricultural societies, and members of local industrial societies to select trustees while refusing to permit

undergraduate students to do so violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Defendants contend both that the selection of the members of the Board of Trustees of Penn State is not "state action" within the meaning of § 1983 and that, assuming that state action exists, there is a rational basis for the distinction drawn between undergraduate students and other persons who are permitted to select trustees so that the equal protection clause is not violated. The Court will deal with these contentions *seriatim*.

■ Defendants argue that the Pennsylvania State University, although initially chartered by the Pennsylvania State legislature and subsequently converted into a "land grant" college, remains a private institution and that the actions of the members of the Board of Trustees, including amending Penn State's charter which governs the method of selecting the Board members, are private and not state actions and are not subject to the strictures of the equal protection clause. They contend that although the Commonwealth of Pennsylvania supplies funds for the operation of Penn State, no members of either the executive or the legislative branches of the Commonwealth other than the ex officio members of the Board of Trustees and the trustees appointed by the governor participate in formulating essential Penn State policy so that the requisite connection between the Commonwealth of Pennsylvania and Penn State's activities is not present. For the following reasons, the Court concludes that all of Penn State's actions are state actions within the meaning of 42 U.S.C. § 1983.

Consideration of whether the actions of Penn State's Board of Trustees constitute state action begins with an analysis of the decision of the United States Court of Appeals for the Third Circuit in *Braden v. University of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977). In *Braden*, the Court set forth in detail two tests which have been developed by the United States Supreme Court for determining whether state action exists. In *Burton v. Wilmington Parking Authori-*

*ty*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) the Supreme Court found that a coffee shop which leased space in a building owned by the Wilmington Parking Authority acted under color of state law when it discriminated against customers on the basis of their race. The Court stated that the activities of the coffee shop and parking authority were so entwined that a "symbiotic relationship" existed and that the actions of the coffee shop could well be deemed the actions of the Authority itself. In *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court, faced with a question of whether a regulated utility was required to afford a customer a hearing before terminating her services, held that the fact that the business is subject to state regulation is not of itself an indication of state action, but that where such regulation exists, inquiry must be made as to "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) *citing Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). These two decisions were reconciled in *Braden v. University of Pittsburgh*, 552 F.2d 948, 958 (3d Cir. 1977) where the Court of Appeals stated that state action exists in either of two situations: When the state and the entity whose activities were challenged are "joint participants" in a "symbiotic relationship" or where the entity is pervasively regulated by the state and a sufficient nexus exists between the state regulation and the challenged activity. If the former situation is found to exist, all of the entity's actions are state actions and a nexus between any state regulation and the action need not be shown. "[T]he state's extensive participation in [a] comprehensive program may obviate a need to show involvement in the specific activity challenged." *Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382, 385 (3d Cir. 1976). It is this Court's view that the Commonwealth of Pennsylvania and Penn State bear such a

close and substantial relationship to each other that the actions of the latter are substantially intertwined with the actions of the former so that the test enunciated in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) is met and the Court need not inquire as to whether the Commonwealth has any extensive involvement in the actual activity complained of, namely the selection of the Board of Trustees.

The Court of Appeals in *Braden v. University of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977), did not decide whether actions taken by the University of Pittsburgh constituted state action for purposes of § 1983 but the Court set forth several factors which should be considered in determining whether the necessary symbiotic relationship exists between a university and the Commonwealth. Those factors include the extent of the Commonwealth's participation in determining who sits on the Board of Trustees, whether the Commonwealth undertakes an extensive review of the expenditure of the University's funds, whether the University is required to report certain expenditures to the Commonwealth, whether the legislature intended to make use of the facilities of the University for its own purposes, and whether any statutory declarations exist as to whether the University is a state institution. The Court of Appeals also relied heavily upon then-District Judge Higginbotham's opinion in *Isaacs v. Board of Trustees of Temple University*, 385 F.Supp. 473 (E.D.Pa.1974) which held that Temple University engaged in state action. In *Isaacs*, 385 F.Supp. at 478, the Court noted its reliance on various other factors, including the extent to which the Commonwealth funded Temple's operations, the fact that Temple was permitted to share in benefits which the Commonwealth has made available for capital improvements, the fact that the Commonwealth had in fact assumed most of the responsibility for Temple's capital development, the fact that Temple lobbied actively in Harrisburg when its budget was being considered by the state legislature, the fact that the Commonwealth audited Temple's expenditures, and the fact that Temple had become increasingly dependent on Commonwealth subsidies. All these thing taken together constituted Pennsylvania's "significant involvement" in the affairs of Temple University.

Keeping these factors in mind, the Court turns to the consideration of Penn State's situation. The parties' undisputed findings of fact indicate that the Governor of Pennsylvania, the Secretary of Education, the Secretary of Agriculture, and the Secretary of Environmental Resources are all ex officio members of the Board of Trustees. Six other members out of a total membership of 32 on that Board are appointed by the Governor. Penn State is obligated to teach, among other subjects, both agriculture and mechanical arts by virtue of its agreement with the Commonwealth. The Commonwealth is committed to an annual appropriation to Penn State and has made such appropriations since 1863. The sums of money appropriated to Penn State by the Commonwealth have constituted 34.5%, 33.8% 33.5% 32.4% and 31.2% of Penn State's total revenues for fiscal years 1971–72, 1972–73, 1973–74, 1974–75, and 1975–76, respectively. The General State Authority, an agency of the Commonwealth, is authorized to construct physical facilities on Penn State's campus and has in fact constructed over $95,000,000 of such facilities since 1968. The General State Authority owns all such buildings which are situated on the Penn State campus. Penn State's employees may participate in the state employee's retirement system and the University pays contributions to that system. The Pennsylvania Department of Transportation is authorized to construct roads on the Penn State campus. In addition to those undisputed facts, the Court takes judicial notice of the opinions of the Pennsylvania Attorney General which have held that Penn State is a state institution for purposes of exemption from the gasoline tax, the Pennsylvania inheritance tax laws, and the Capital Stock Tax, *see* Ops.Atty.Gen. December 21, 1921, December 23, 1921 and January 10, 1939, and that the annual appropriations acts impose

auditing restrictions on Penn State very similar to those applicable to Temple University which are found in the Act of July 28, 1966, P.L. 87, § 7, 24 Pa.Stat.Ann. § 2510–207. The Court believes it is unquestionable that from the foregoing facts the Commonwealth has direct participation in determining at least some of the members of the Board of Trustees, that the Commonwealth does review Penn State's expenditure of Commonwealth funds, that the legislature intended Penn State to be a state educational institution, that the Attorney General of Pennsylvania has consistently regarded Penn State as such an institution, that Penn State partakes of benefits available for its capital development, that it relies exclusively upon the general state authority for such development, and that Penn State is substantially dependent on Commonwealth subsidies. Therefore, the requisite amount of "significant involvement" by the Commonwealth in Penn State's affairs is present and, under *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), Penn State's actions are "state actions." The Court recognizes that several cases cited by Defendants indicate that some Pennsylvania courts have held that Penn State is not a state agency for various state purposes but those decisions do not deal with the question of whether Penn State's actions are state actions within the meaning of 42 U.S.C. § 1983 and are not binding upon this Court.

Although Defendants have represented in their brief that whether state action is present in Penn State's personnel activities is not an issue in this case, the Court believes that a fair reading of *Braden v. University of Pittsburgh,* 552 F.2d 948 (3d Cir. 1977) indicates that this Court should decide on the basis of the Commonwealth's substantial involvement with Penn State that all of the latter's activities are state actions. Whether any other Courts have so decided is of moment. In *Klain v. Pennsylvania State University,* 434 F.Supp. 571, 574 (M.D. Pa.1977) (Herman, J.) the Court held that Penn State had a sufficient nexus with the Commonwealth of Pennsylvania so that its actions were state actions. The attorneys representing Penn State in this case also represented the University before Judge Herman. The Court is disturbed by counsel's failure to bring Judge Herman's decision to the attention of this Court.

Because the Court has held in favor of the Plaintiffs on the question of state action, it must now determine whether the method which Penn State uses to select the members of its Board of Trustees violates the Equal Protection Clause. The Plaintiffs may make out a violation of their equal protection rights in two ways. First, if the Board's procedures are to be subject to strict judicial scrutiny, the Plaintiffs must first establish that the selection process is an "election" rather than an appointive process. *Compare Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) and *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) *with Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) *and Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967). Second, they must show that Penn State is an entity exercising traditional governmental functions rather than a special purpose governmental unit. *Compare Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) *with Salyer Land Co. v. Tulare Water District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). If Plaintiffs can meet their burden of demonstrating that the scheme utilized by the Board constitutes an election of general interest of a traditional governmental body and that Plaintiffs have been denied the franchise, the burden shifts to the Defendants to demonstrate that the exclusion of the Plaintiffs from the selection process is not necessary to further a compelling state interest. *See Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). If the Plaintiffs fail to demonstrate that the method of selecting the Board members is such an election, however, then the inclusion of Penn State alumni and

members of agricultural and industrial societies and the exclusion of students from the selection process must be upheld so long as there is some rational basis for the distinction drawn between the groups. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

In *Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), the Court was faced with an equal protection challenge to Michigan's scheme of selecting members of its county school boards. The members of local school boards were elected by popular vote of the residents of the School District and those boards in turn selected delegates from among their members who, at a biannual meeting, chose a 5-member county school board. The Court indicated that had Michigan provided for direct election of the members of the County school board, each person voting in the election would have been entitled to have his vote weighed equally with every other person's vote but that there was no constitutional mandate that Michigan provide for such direct election of local governmental officials. Plaintiffs concede this point and state that they have no objection to the appointment of members of Penn State's Board of Trustees by the governor or the fact that the President of Penn State and four other state government officials sit as *ex officio* members of the Board. However, they contend that the remaining 21 members of the Board, nine of whom are selected by Penn State alumni and the remaining 12 of whom are selected by local industrial and agricultural societies are "elected" and that Plaintiffs, as undergraduate students, should be entitled to participate in the election. The Court believes that the manner of each group's selection of members of the Board must be examined separately in order to determine whether it constitutes an appointment or an election for constitutional purposes.

Local agricultural societies select their representatives to the Board of Trustees as follows: In December and January of each year, the University sends to each county agricultural extension director the list of agricultural societies which are eligible to send delegates for the selection of agricultural trustees during the previous commencement week. Each extension director determines whether those societies are still in existence and whether any new societies should be added to the list. A list of agricultural organizations is also submitted by the Secretary of Agriculture. In March, following the return of the approved list of agricultural societies, the University invites each such approved organization to participate in selecting members of the Board of Trustees. The societies select delegates by volunteering, by appointment or by election. The delegates are informed of the time and place of the upcoming election and, if there are more candidates than available seats on the Board, the delegates cast ballots and elect the requisite number of Board members. The members of the Board representing local industrial societies are selected in an essentially identical manner.

The Court believes that the selection process utilized by the local agricultural and industrial societies does not constitute an election of the general interest as defined in the relevant precedents. Those cases involving disenfranchisement of a selected group in an election of general interest all involve a much more formal and structured election scheme. In *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) the Court held unconstitutional the election of a local school board by school district voters who, in addition to meeting age and citizenship requirements, either owned or leased taxable real property in the school district, were the spouses of such owners or lessees, or were the parents or guardians of children enrolled for a specified time during the preceding year in a local district school. The Court characterized the legislative enactment which set forth the manner of election as a statute "distributing the franchise" and concluded that such a statute granting the franchise to residents on a selective basis violated the equal protection clause.

In *Salyer Land Co. v. Tulare Water District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), the election in question involved the selection of members of a water storage district where only landowners in the district could vote in the election. *Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975) involved a provision limiting the right to vote in a city bond election to persons who had listed property for taxation in the Western District near the election. Other cases involving selective disenfranchisement also involved local bond issues. *See City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) and *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

The elections involved in each of those cases shared certain common features. The group from which qualified voters were chosen was an identifiable group of persons from a certain geographical district who were otherwise qualified to vote in a general election. Most of the elections were held at the same time as the general election and simply limited the ability of otherwise qualified voters to cast ballots on certain issues. Finally, in each case where the Court found a constitutional violation, the remedy was apparent, namely that those otherwise qualified voters of the particular district would be permitted to participate in the election from which they had been prohibited.

The Court is of the view that the method utilized by the local industrial and agricultural societies in selecting members of Penn State's Board of Trustees does not fall within the type of election which was at issue in each of the above-cited cases. First, the Court is not convinced that there was any election process at all. Rather, the selection process closely resembles that which was upheld by the Supreme Court in *Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). The only difference is that in *Sailors* the bodies which selected the delegates who chose the members of the County School Board were themselves elected by the general public. In this case, the selection process is completely removed from any such public elec-

tion. The agricultural and industrial societies are private organizations with members who are not elected by the public so that even if they did not choose delegates who in turn selected their representatives on Penn State's Board of Trustees, their selection of such board members would be an appointment by a private society rather than an election by the general public. Such an appointment is clearly a constitutionally acceptable method of selecting Board members. *See Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). The persons complaining of "disenfranchisement" in this case, namely undergraduate students at Penn State, do not stand in the same relationship to the members of the agricultural and industrial societies as that of the disenfranchised voters in any of the above cases or to those who were qualified to vote. There is no requirement that members of the agricultural and industrial societies be otherwise qualified to vote in popular elections and they do not represent well-defined voting "districts." Therefore, the Court concludes that the distribution of the franchise as defined by the United States Supreme Court is not involved in this selection scheme and does not reach the questions of whether Penn State's Board of Trustees is a traditional governmental body or whether a compelling interest justifies the distinction made between members of the agricultural and industrial societies and undergraduates of Penn State.

The selection process utilized by Penn State alumni is different from that of the agricultural and industrial societies. No later than February 1 of each year ballots are sent by Penn State to alumni who either have been active members of the alumni association, who have contributed to the university within the past two years or who have specifically requested such a ballot. When the nomination ballots are returned, any nominee receiving 50 or more votes becomes eligible for election as a member of the Board of Trustees. Formal election ballots are mailed to the alumni no later than April 15 and must be returned by a certain date. Approximately 50,000 nomination

ballots are mailed out and approximately 14,000 alumni cast election ballots each year.

■ Although this selection process differs somewhat from that of the agricultural and industrial societies, the Court is not convinced that it involves the kind of distribution of the franchise which the Supreme Court intended to be subject to the strictures of the equal protection clause in its most demanding form. Again, there is no specified geographical district from which the electors must come. No age or residency requirements are imposed. In fact, it is likely that such alumni electors live in various parts of the United States and not just in Pennsylvania. The disenfranchised group, the undergraduate students, does not bear the kind of relationship to the alumni which otherwise qualified members of a particular geographical district bear to electors who are permitted to vote in an election which affects some general interest and which is conducted concurrently with or in the same manner as a general election. Rather, the alumni selection of members of the Board of Trustees is an informal process more akin to the selection of the board members by a private organization than the election of such members by the general public. Therefore, the Court concludes that the undergraduate students' right to vote is not implicated by the decision of Penn State to utilize the above-described methods in selecting its members from among alumni and representatives of local agricultural and industrial societies and the alleged discrimination engaged in by Penn State against the undergraduate students must be judged under a rational basis standard.

■ The Court is convinced that to reach any other conclusion on this set of facts would be to stretch the voting rights decisions of the United States Supreme Court beyond all recognition. If the Court concluded that Penn State's trustees are selected by a general public election, it would be forced to hold that all interested persons now excluded from the election would be entitled to an equal voice in the selection of the Board members. Such a holding would

extend far beyond the Plaintiffs in this case and could in fact require the election of board members by every qualified voter in the Commonwealth of Pennsylvania, there being no other identifiable geographic area from which voters could be drawn. While the difficulty of a remedy is not the basis of this Court's conclusion that no election is involved in this case, it is one factor to be considered when construing how far the decisions of the Supreme Court go in extending the equal protection clause to certain types of state action.

■ The remaining issue in this case is whether a rational basis exists for the distinction which Penn State has drawn between members of local agricultural and industrial societies and its alumni and the undergraduate students at the University. In *McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), the Court stated that in a situation involving the state's differentiation between certain classes of citizens a violation of the equal protection clause can be made out only "if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." A state does not violate the equal protection clause even if the classification which it has imposed is not the best means to accomplish the underlying state objective and such state action is presumptively valid. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314–16, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam).

■ Penn State was begun as the "Farmer's High School of Pennsylvania" and under the statute providing for the donation of public lands for the benefit of one or more colleges of each state, 7 U.S.C. §§ 301 et seq., became a land grant college committed to the teaching of agriculture and the mechanic arts. Therefore, Penn State argues that because of its historic commitment to both agriculture and industrial goals, it is entitled to give members of agricultural and industrial societies a voice in the operation of the university to the exclusion of other interested groups. The Court cannot say as a matter of law that

the distinction made between agricultural and industrial societies and other interested groups, including undergraduate students, is wholly unrelated to the achievement of Penn State's underlying objective which is the governance of the affairs of the University. Therefore the charter provisions which give local agricultural and industrial societies a voice in selecting members of Penn State's board of trustees but which deny it to undergraduate students do not violate the equal protection clause.

Penn State also suggests that the distinction drawn between alumni and undergraduate students is not wholly irrational. It contends that those alumni who seek election to the Board of Trustees are Penn State graduates who have a continuing interest in the affairs of the University. They argue that an alumnus' undergraduate experience plus his societal standing make him a candidate with knowledge of Penn State's concerns and the ability to make important contributions to the University.

The Plaintiffs contend, however, that because many of the decisions of the Board of Trustees have a substantial impact on the undergraduate students at the University, it is irrational to permit alumni to have a voice in the University's affairs to the exclusion of the undergraduate students even though it would not be irrational, in a non-discriminatory scheme, to permit the alumni to elect trustees. On this point, the Court is not persuaded by Penn State's argument that even though the effect of board action on the lives of the students might be greater than its effect on the lives of alumni, the undergraduate student body as a whole would not provide candidates for board membership who would be able to maintain the objectivity needed to govern the affairs of Penn State. Penn State suggests that because the Board sets student tuition rates, students might not be impartial when voting on such an issue. Penn State has cited a study in support of its position which suggests that it be advisable that students who serve on college boards of trustees be selected from institutions other than the one whose affairs are gov-

erned by that board. Although this Court, were it in a position to pass on the wisdom of Penn State's decision to deny its own students representation on the Board of Trustees, might well conclude that students should be represented and that they would make important contributions to the resolution of such issues as the proper amounts of tuition the precise legal issue before the Court is whether Penn State's decision is wholly irrational or totally unrelated to its objective of governing the University. Penn State has cited the aforesaid study as objective evidence in support of its action and its decisions in this area are presumptively valid. The Court cannot say that it is wholly irrational for Penn State to attempt to choose the members of its Board of Trustees from persons who have a generalized interest in the University's affairs and who would, in Penn State's opinion, be able to maintain their objectivity towards substantially all of the university's actions. Therefore, Penn State's actions do not violate the equal protection clause of the United States Constitution.

The Plaintiffs in this case had originally requested that it be certified as a class action. That request was denied by this Court on September 27, 1977 following a hearing directed to that issue. On December 20, 1977, the Plaintiffs filed a renewed motion for class certification accompanied by a brief and by supporting affidavits. On December 27, 1977 Defendants filed a brief in opposition to that motion. Plaintiffs filed a reply brief on December 30, 1977. At the pretrial conference in the above-captioned case which was held on January 3, 1978, although neither side desired a hearing on the class action point, it was ordered in accordance with the Court's standard practice that a hearing on the class action issue would be held when the case was reached on the January trial list and it is presently the next case but one on that list. It is this Court's view that certification of a class action is of such importance that the Court should normally see and hear the proposed class representatives in order to determine their fitness to represent the class. However, because the case has now

been decided in favor of the Defendants who have opposed class certification, and because the parties have entered into a stipulation which was filed January 17, 1978 indicating that they do not desire that a hearing be held on the class action point, the Court will deny Plaintiffs' renewed motion at this time and will not hold a class certification hearing unless the Plaintiffs request within 4 working days of the date of this Order that one be held.

### IV. Conclusions of Law.

1. Penn State's actions in choosing which groups shall have a voice in the selection of members of its Board of Trustees are state action for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

2. The process utilized by Penn State in selecting its Trustees is not an election of general interest in which the public participates.

3. Penn State's decision to permit members of local agricultural and industrial societies and University alumni but not undergraduate students to select members of the Board of Trustees is not totally irrational or wholly unrelated to its objective of governing the University.

4. Penn State's actions do not violate the Equal Protection Clause of the Fourteenth Amendment.

An appropriate order will be entered.