592 F.2d 174
 Drianne BENNER, Jeffrey Glazier, James Scarantino, Anne
Ziminski, Charles J. Zito, Appellants,
v.
John W. OSWALD, President of Pa. State University, Milton J.
Shapp, Governor of the Commonwealth of Pa., Kent Shelhammer,
Secy. of Agriculture of C. of Pa., Caryl Kline, Secy. of
Education of the C. of Pa., Maurice K. Goddard, Secretary of
Environmental Resources, C. of Pa., Harry Boyer, Helen
Davies, Joseph Rhodes, Jr., Robert L. Ruttenberg, Dion C.
Stewart, William K. Ulerich, H. Jesse Arnelle, Marian U.
Barash, Walter J. Conti, Barbara H. Franklin, Ralph Hetzel,
Kenneth L. Holderman, Charles W. Shaeffer, Helen Wise, J.
Lin Huber, John M. Phillips, John R. Pitzer, Jr., Luther
Snyder, Harry R. Ulrich, J. Lewis Williams, H. Thomas
Hallowell, Jr., Samuel F. Hinkle, John L. Romig, Stanley G.
Schaffer, G. Albert Shoemaker, and Quentin E. Wood.
 No. 78-1338.
 United States Court of Appeals, Third Circuit.
 Argued Nov. 13, 1978.
Decided Jan. 24, 1979.
 
 Alan B. Morrison, Diane B. Cohn, Washington, D. C., Thomas B. Schmidt, III, Harrisburg, Pa., for appellants.
 Delbert J. McQuaide, R. Mark Faulkner, McQuaide, Blasko & Brown, Inc., State College, Pa., for appellees.
 Before ALDISERT and HUNTER, Circuit Judges and STEEL, District Judge.*
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The question is whether the equal protection clause of the fourteenth amendment requires undergraduate student participation in the election of certain members of the Pennsylvania State University (Penn State) board of trustees. The district court ruled that the students had no such right. They have appealed. Finding no error, we affirm.
 
 
 2
 All material facts are set forth in stipulated findings contained in the district court opinion, Benner v. Oswald, 444 F.Supp. 545 (M.D.Pa.1978). The board of trustees is composed of 32 members. Five serve as ex officio members including the president of the University, the state governor and three members of his cabinet. Six other trustees are appointed by the governor with the consent of the senate. The student appellants do not challenge the method by which these eleven trustees are selected, but they do challenge the selection of the remaining 21 trustees. Of this latter group, 9 trustees are elected by the alumni association and 12 are elected by the members of county agricultural and industrial societies of Pennsylvania. Students Qua students, therefore, do not participate in the election process. They complain that the refusal to allow them to participate in the selection process of these 21 trustees denies them rights guaranteed by the equal protection clause.
 
 
 3
 They argue preliminarily that the selection process involves state action, thus affording them a procedural vehicle under 42 U.S.C. § 1983[1] to obtain relief in a federal forum. Substantively, they mount alternative arguments: first, they contend that Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), is controlling judicial precedent, requiring appellees to demonstrate that a compelling state interest justifies the trustee selection process. Alternatively, they argue that the selection process cannot pass scrutiny under the less rigorous rational relationship test. The district court agreed with them that requisite state action was present, but held that the proper standard of classification was the rational relationship test, and relying on the McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1011, 6 L.Ed.2d 393 (1961), formulation that the process would be set aside only if the classification is "wholly irrelevant to the achievement of the state's objective," held that the necessary relationship was present.
 
 I.
 
 4
 Alumni trustees are chosen for staggered three-year terms and are elected in a process that begins early in each year when nomination ballots are mailed by the University to alumni who have been active members of the alumni association or who have contributed to the University within the past two years or who specifically request a nomination ballot. Approximately 50,000 nomination ballots are mailed. All nominees receiving 50 or more votes are eligible for the election if they consent. Normally between 8 and 12 nominees vie for the three positions. Election ballots are then mailed to the alumni and approximately 14,000 alumni cast their ballots each year.
 
 
 5
 Agricultural and industrial trustees, also chosen for staggered three-year terms, are elected by specially chosen delegates during the annual commencement week. The agricultural trustee selection process begins around January when the University sends to all county agricultural extension directors the list of agricultural societies which were eligible to send delegates during the previous year. Each county agricultural extension director determines whether the agricultural societies for his county remain eligible and whether there are new societies to be added to the eligibility list. At the time of the district court hearing there were 397 agricultural societies eligible to send delegates. The industrial trustee selection process is similar. The University determines which industrial societies and associations were eligible to send delegates the previous year. The list is sent to five officials who are responsible for updating the list.[2] At the time of the district court hearing, 160 mining, manufacturing and engineering societies were eligible to send delegates. Approximately 450 delegates participate annually. In 1977, there were 207 delegates representing agricultural societies, and 198 delegates representing industrial societies.
 
 II.
 
 6
 Our inquiry into state action must begin with a description of the University.
 
 A.
 
 7
 Penn State was created by statute in 1855, 24 P.S. § 2531 Et seq., and was originally known as the Farmers' High School of Pennsylvania. The enabling act provided great detail about the purposes of the school and the subjects to be taught: "the English language, grammar, geography, history, mathematics, chemistry and such other branches of the natural and exact sciences as will conduce to the proper education of a farmer." 24 P.S. § 2542. The statute also established the time and place of the first meeting of the trustees, and directed them to obtain a tract of land and to make improvements thereon for "an institution properly adapted to the instruction of youth in the art of farming . . . ." 24 P.S. § 2541. The statute also set the number of original trustees, specified that the governor, the secretary of the commonwealth, the "principal of the institution," and the president of the state agricultural society shall be ex officio members of the board, and designated the nine other trustees by name. 24 P.S. § 2533. Successors to the original designated trustees were to be elected annually by delegates of each county agricultural society in the commonwealth. 24 P.S. § 2535.
 
 
 8
 The institution broadened somewhat in 1862 when Congress passed the Morrill Act, which established land grant colleges. 7 U.S.C. § 301 Et seq. Under the Act, Congress provided land and other assistance for state universities that taught both agriculture and mechanical arts, provided that the state agreed to accept the terms and conditions of the congressional mandate. The commonwealth agreed to those conditions by necessary legislation and expanded the size of the board of trustees by subsequent legislation. Annually, trustees adopt the operating budget and determine the level of tuition to be paid by students in the next academic year. The level of tuition is based on estimates of expense and of income from other sources, including the estimated amount of the state appropriation, endowment income, recovery of indirect costs on government contracts and other miscellaneous sources. The commonwealth provides an annual appropriation to the University, representing over 30% Of the total revenues received.[3] In addition it makes grants for special projects; students have received substantial scholarship aid from Pennsylvania ranging from $6 million to $9 million annually from 1971 through 1976.
 
 
 9
 In addition, the Pennsylvania General State Authority (GSA) has provided physical facilities to the University for many years. Since 1968 the GSA has constructed on the campuses of the University educational buildings valued at approximately 95 million dollars. These improvements were made pursuant to statute, 71 P.S. § 1707.4. The GSA holds legal title to these buildings and to the land upon which they are constructed. In every instance, the University has conveyed title to the land by general warranty deed, and utilizes the GSA buildings in its educational functions and for no other purpose.
 
 
 10
 University employees may be members of the State Employees' Retirement System, 71 Pa.C.S. § 5101 Et seq.; the University pays its employer's contribution into the retirement system fund from its general operating revenues. Roads on University campuses may be constructed by the Pennsylvania Department of Transportation, 36 P.S. § 670-601.
 
 B.
 
 11
 Appellees would have us affirm the judgment of the district court without addressing the merits of the constitutional issues. They would have us do this, albeit for reasoning inconsistent with that of the trial court, Rhoads v. Ford Motor Co., 514 F.2d 931, 934 (3d Cir. 1975), by holding that the actions and selection of the board of trustees do not amount to state action for purposes of the equal protection clause. They contend that although Pennsylvania supplies funds for the operation of the University, no members of either the executive or the legislative branches of the commonwealth participate officially in the selection process of the board. They argue that other than the ex officio trustees and the trustees appointed by the governor, no state officers participate in formulating essential University policy. Accordingly, they urge us to conclude that the requisite connection between the commonwealth and the University is not present. We disagree and determine that there is sufficient state involvement to constitute state action within the meaning of 42 U.S.C. § 1983.
 
 
 12
 Significant decisions of this court and in this circuit compel this conclusion. In Magill v. Avonworth Baseball Conference, 516 F.2d 1328 (3d Cir. 1975), we analyzed the considerations necessary to determine whether the conduct of a private entity falls within the rubric of state action. We said:
 
 
 13
 Any discussion of the "protean concept" of state action must begin with the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). It was there the Supreme Court first enunciated the principle that "(i)ndividual invasion of individual rights is not the subject-matter of the (Fourteenth) amendment"; only "state action of a particular character . . . is prohibited." Ibid. at 11, 3 S.Ct. at 21.
 
 
 14
 Notwithstanding the Civil Rights Cases, subsequent decisions of the Supreme Court have pierced the seemingly impenetrable veil of private, individual conduct to find state action. These cases have the capability of being grouped into three general categories: (1) where state courts enforced an agreement affecting private parties; (2) where the state "significantly" involved itself with the private party; and (3) where there was private performance of a government function.
 
 
 15
 516 F.2d at 1331 (footnotes omitted). In Hollenbaugh v. Carnegie Free Library, 545 F.2d 382 (3d Cir. 1976), we made certain observations which are especially applicable here:
 
 
 16
 (T)he polestar of our analysis must be whether the state involvement in the challenged action of the (University) is "significant", See Reitman v. Mulkey, 387 U.S. 369, 378, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), that is "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action . . . so that the action of the latter may be fairly treated as that of the State itself," Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), Or whether the "State has so far insinuated itself into a position of interdependence with (the University) that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961).
 
 
 17
 A nexus test is necessarily one of degree. As we observed in Magill, the Supreme Court has not fashioned "any definitive state action formula"; rather, the Court "admits to extreme difficulty in articulating an all-inclusive test and seems to emphasize that, within the confines of certain guidelines, the presence or absence of state action must be determined on a case-by-case basis." 516 F.2d at 1332 (footnotes omitted).
 
 
 18
 545 F.2d at 383 (emphasis added).
 
 
 19
 It is significant that Hollenbaugh expressed the test in the disjunctive: state action could be found by examining the challenged activity under Either the Jackson rule, Or the Burton rule.
 
 
 20
 In Chalfant v. Wilmington Institute, 574 F.2d 739, 744 (3d Cir. 1978) (in banc), we dispelled any possible uncertainties in this respect and put to rest the very argument relied upon by the appellees in these proceedings:
 
 
 21
 In Braden v. University of Pittsburgh, 552 F.2d 948, 957 (3d Cir. 1977) (en banc), we reiterated the Hollenbaugh holding that Jackson had not substituted a single nexus test for an ad hoc analysis of the facts and circumstances of each case as it arises. Braden also recognized explicitly that Jackson did not overrule Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In dealing with Burton, Judge Adams, writing for this court in Braden observed:
 
 
 22
 Speaking for a unanimous panel (in Hollenbaugh v. Carnegie Free Library ), Judge Aldisert declared: "The state's extensive participation in the comprehensive program may obviate a need to show involvement in the specific activity challenged (as) is illustrated by Burton . . . ."
 
 
 23
 552 F.2d at 958 n.45. Thus, the law in this circuit is clear. The Jackson nexus test, whatever it means in the context of the activities of what the Supreme Court considers to be private enterprises, cannot be applied mechanically in other contexts. We have expressly rejected the application of the Jackson test, which was enunciated within the context of a private enterprise electric utility, to the analysis of state action in a public library, a university, or any other public educational institution. Hollenbaugh and Braden hold that the status of the individual actor is irrelevant if the institution on whose behalf he acted is found, upon an examination of all the relevant factors, to be an instrumentality of a state or local government.
 
 
 24
 574 F.2d at 744-45 (footnotes omitted).
 
 
 25
 We therefore conclude that the district court properly analyzed and applied the teachings of this court by determining that state action could be found, either (1) when the state and the entity whose activities were challenged are joint participants in a symbiotic relationship or (2) where the entity is pervasively regulated by the state and a sufficient nexus exists between the state and the challenged activity. "If the former situation is found to exist, all of the entity's actions are state actions and a nexus between any state regulation and the action need not be shown." 444 F.Supp. at 556. We specifically adopt the following observations and determinations of Judge Muir, the trial judge:The parties' undisputed findings of fact indicate that the Governor of Pennsylvania, the Secretary of Education, the Secretary of Agriculture, and the Secretary of Environmental Resources are all ex officio members of the Board of Trustees. Six other members out of a total membership of 32 on that Board are appointed by the Governor. Penn State is obligated to teach, among other subjects, both agriculture and mechanical arts by virtue of its agreement with the Commonwealth. The Commonwealth is committed to an annual appropriation to Penn State and has made such appropriations since 1863. The sums of money appropriated to Penn State by the Commonwealth have constituted 34.5%, 33.8%, 33.5%, 32.4% And 31.2% Of Penn State's total revenues for fiscal years 1971-72, 1972-73, 1973-74, 1974-75, and 1975-76, respectively. The General State Authority, an agency of the Commonwealth, is authorized to construct physical facilities on Penn State's campus and has in fact constructed over $95,000,000 of such facilities since 1968. The General State Authority owns all such buildings which are situated on the Penn State campus. Penn State's employees may participate in the state employee's retirement system and the University pays contributions to that system. The Pennsylvania Department of Transportation is authorized to construct roads on the Penn State campus. In addition to those undisputed facts, the Court takes judicial notice of the opinions of the Pennsylvania Attorney General which have held that Penn State is a state institution for purposes of exemption from the gasoline tax, the Pennsylvania inheritance tax laws, and the Capital Stock Tax, . . . and that the annual appropriations acts impose auditing restrictions on Penn State . . . . The Court believes it is unquestionable that from the foregoing facts the Commonwealth has direct participation in determining at least some of the members of the Board of Trustees, that the Commonwealth does review Penn State's expenditure of Commonwealth funds, that the legislature intended Penn State to be a state educational institution, that the Attorney General of Pennsylvania has consistently regarded Penn State as such an institution, that Penn State partakes of benefits available for its capital development, that it relies exclusively upon the general state authority for such development, and that Penn State is substantially dependent on Commonwealth subsidies. Therefore, the requisite amount of "significant involvement" by the Commonwealth in Penn State's affairs is present and, under Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), Penn State's actions are "state actions."
 
 
 26
 Benner v. Oswald, 444 F.Supp. 545, 557-58 (M.D.Pa.1978).
 
 
 27
 Accordingly, we agree with the district court that the stipulated record here demonstrates state action. Our determination is in accordance with the pioneer decision in this field authored by our brother Higginbotham (then a district judge) in Isaacs v. Board of Trustees of Temple University, 385 F.Supp. 473 (E.D.Pa.1974).[4]
 
 III.
 
 28
 We turn now to the constitutional arguments advanced by the student appellants. At the beginning of the 1960's judicial intervention under the banner of equal protection was virtually unknown outside racial discrimination cases.[5] In recent years the concept has been given broad judicial expansion in matters affecting criminal trials, interstate travel, alienage, and a host of other social, economic and political interests including voting. In all equal protection cases some classification has occurred, but the standard of judicial scrutiny is usually dependent upon the subject matter of the classification. In some cases the classification itself is deemed suspect.[6] In others, while the classification is not suspect, the individual right affected is denominated as fundamental. For example, voting in a governmental election is considered a fundamental right. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). See also Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of a uniquely private nature); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right of interstate travel); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (rights guaranteed by the first amendment); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate). If the case involves a fundamental right or a suspect classification, the state activity will be subject to strict judicial scrutiny and will prevail only if the state shows that such action is justified by a "compelling state interest." American Party of Texas v. White, 415 U.S. 767, 780, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).
 
 
 29
 On the other hand, state regulations bearing upon rights and classifications not so denominated are subject to a relatively relaxed standard of judicial scrutiny, and will pass muster if the purpose of the classification bears some rational relationship to a legitimate state purpose.[7] San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). As the Supreme Court has recently stated: " 'The Fourteenth Amendment does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state.' . . . Rather, the Equal Protection Clause is offended only if the statute's classification 'rests on grounds wholly irrelevant to the achievement of the State's objective.' . . ." Holt Civic Club v. Tuscaloosa, --- U.S. ----, ----, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978) (citations omitted). The rational basis standard presumes such legislative action to be valid. It reflects the courts' awareness that the drawing of lines which create distinct classifications is peculiarly a legislative task and an unavoidable one. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).
 
 
 30
 The student appellants advance two arguments in their constitutional attack on the trustee selection process. Primarily, they contend they are being denied a fundamental right to vote and the selection process must therefore be scrutinized under the compelling state interest test. In this regard, the students assert that the teachings of Kramer v. Union School District, 395 U.S. 621, 89 S.Ct. 1886, 22 L.Ed.2d 58 (1969), and similar cases should control the disposition of this case. Alternatively they urge that even if we examine the selection process under the less stringent rational basis test we should find it constitutionally defective.A.
 
 
 31
 We must first determine which test to employ in our analysis. The students assert that a right to vote for trustees of a university is equivalent to a right to vote for elected members of local, state and federal government. They suggest that their individual interest denied by the University's method of selecting trustees is equivalent to the denial of an individual's right to vote in public elections.[8]
 
 
 32
 In Kramer, supra, at issue was a New York statute that limited the right to vote in local school board elections to persons, otherwise eligible to vote in general elections, who owned or leased taxable real property in the school district or who had children enrolled in public school in the particular district. The Court held that in an election of general interest, voting restrictions other than those pertaining to residence, age and citizenship must promote a compelling state interest in order to be constitutional. Because the New York statute in question did not accomplish the articulated state goal with sufficient precision, it was struck down as a denial of equal protection. 395 U.S. at 632, 89 S.Ct. at 1892.
 
 
 33
 Likewise, in Hadley v. Junior College District of Kansas City, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), certain residents and taxpayers of the Kansas City school district, one of eight school districts which made up the junior college district of metropolitan Kansas City, mounted a constitutional assault on the Missouri statute that apportioned their right to vote for the trustees who conducted and managed the affairs of the junior college district. The statute provided for the election of six trustees and for the apportionment to be made on the basis of the number of school age children who reside in each district. The Kansas City school district contained approximately 60% Of the total number of school age children in the junior college district but was apportioned only 50% Of the total number of trustees. In holding that the right to vote for trustees had been unconstitutionally diluted, the Court determined that "as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election . . . ." Id. at 56, 90 S.Ct. at 795.
 
 
 34
 Examining these teachings we note that the cases involve general government elections. Such elections are seen as directly relating to the Constitution: "statutes distributing the franchise constitute the foundation of our representative society." Kramer, supra, 395 U.S. at 626, 89 S.Ct. at 1889. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 553 at 555, (84 S.Ct. 1362, 1378, 12 L.Ed.2d 506) (1964) (footnote omitted). "Like Skinner v. Oklahoma, . . . such a case 'touches a sensitive and important area of human rights,' and 'involves one of the basic civil rights of man,' . . . . Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise (one's vote) in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in Yick Wo v. Hopkins, 118 U.S. 356, (6 S.Ct. 1064, 30 L.Ed. 220), the Court referred to 'the political franchise of voting' as 'a fundamental political right, because preservative of all rights.' 118 U.S., at 370, (6 S.Ct. 1064)." Id., 377 U.S. at 561-62, 84 S.Ct. at 1381.
 
 
 35
 But we refuse to accept the formulation of the student appellants that the right to vote for a university trustee is equivalent to a right to vote in a participatory democracy. We will not conclude that the University trustee selection process is a general public election, or that the trustees perform general governmental functions. The University's board of trustees controls no viable political sub-division and has less power than a local school district. It cannot acquire property by condemnation, levy or collect taxes, or pass on petitions to annex school districts. It simply does not possess the minimum governmental powers associated with municipal, school district, county, state, or federal offices. At most, the board has the authority to approve a budget and set a level of tuition. And even in the setting of tuition, they do not have a free hand. The parties have stipulated that "(t)he level of tuition is based upon estimates of expense and of income from other sources, including the estimated amount of the state appropriation, endowment income, recovery of indirect costs on government contracts and other miscellaneous sources." 444 F.Supp. at 555.
 
 
 36
 With regard to the students' contention, we are mindful of Justice Holmes' observation in Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908):
 
 
 37
 All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. . . . The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.
 
 
 38
 Paraphrasing the Supreme Court's latest decision in this field which made a reference to Holmes's statement, "The line heretofore marked by (the Supreme) Court's voting qualifications decisions coincides with the (public and political nature) of the governmental unit at issue, and we hold that appellants' case . . . falls on the farther side." Holt Civic Club v. Tuscaloosa, supra, --- U.S. at ----, 99 S.Ct. at 390.
 
 
 39
 We therefore conclude that the duties of the trustees are not commensurate with the duties of elected public officials; that these duties do not involve the responsibilities going to "the essence of a democratic society," and do not implicate decisions that are "preservative of all rights." Because the trustees' duties do not approach the quantum of responsibilities of officials selected in a political democracy, we conclude that any individual interests affected by the selection process classifications are not fundamental rights so as to require recourse to the strict judicial scrutiny standard.
 
 B.
 
 40
 Our remaining task is to decide whether any rational basis exists to support the distinction which limits participation in the trustee selection process to members of local agricultural and industrial societies and alumni.
 
 
 41
 The University originated as the Farmers' High School of Pennsylvania and under the federal statute providing the donation of public lands, it became a land grant college committed to the teaching of agriculture and the mechanic arts.[9] We agree with Judge Muir's determination:
 
 
 42
 Penn State argues that because of its historic commitment to both agriculture and industrial goals, it is entitled to give members of agricultural and industrial societies a voice in the operation of the university to the exclusion of other interested groups. The Court cannot say as a matter of law that the distinction made between agricultural and industrial societies and other interested groups, including undergraduate students, is wholly unrelated to the achievement of Penn State's underlying objective which is the governance of the affairs of the University. Therefore the charter provisions which give local agricultural and industrial societies a voice in selecting members of Penn State's board of trustees but which deny it to undergraduate students do not violate the equal protection clause.
 
 
 43
 444 F.Supp. at 561-62.
 
 
 44
 Allowing alumni to participate in the selection process is justified by the premise that those alumni who cast ballots are graduates of the University who have a continuing interest in its affairs. Alumni support of their Alma mater is a universal phenomenon in the United States and alumni provide an important source of political, social, and financial sustenance. The record here reveals that for the period 1953 through 1977 alumni have contributed the sum of $11,247,076 through lifetime gifts or testamentary bequests. An alumni association has been active at Penn State for over 100 years, and the record demonstrates significant participation in University activities.
 
 
 45
 Applying the rational basis test, we cannot conclude that the trustee selection process which limits participation to alumni and agricultural and industrial groups is irrational. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).
 
 
 46
 Because we affirm the judgment in favor of the appellees, and because this was a case stated in the district court, appellants' contention relating to class action determination is moot.
 
 
 47
 The judgment of the district court will be affirmed.
 
 
 
 *
 Honorable Edwin D. Steel, Jr., of the United States District Court for the District of Delaware, sitting by designation
 
 
 [1]
 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [2]
 The officials are the Secretary of Environmental Resources, the Executive Secretary of the Pennsylvania Society of Professional Engineers, the Secretary of the Pennsylvania Manufacturers' Association, and the Assistant Deans for Continuing Education in the Colleges of Engineering and Earth and Mineral Sciences
 The election of trustees by the engineering, mining, manufacturing and mechanical societies and associations is conducted largely through and under the auspices of the Pennsylvania Manufacturers' Association (hereinafter PMA), organized in 1909 as a nonprofit, unincorporated association having as its purpose the promotion of "the welfare of its members and the economic prosperity of the Commonwealth of Pennsylvania and its manufacturing and service industries." The PMA is a broadbased organization with over five thousand (5000) dues paying members, comprised of individual members, organizational members, and trade association members in Pennsylvania. It has local chapters and appointed secretaries in 41 counties of the 67 in the Commonwealth of Pennsylvania. In addition, PMA maintains liaison with autonomous manufacturing associations located in 13 counties.
 
 
 [3]
 The parties stipulated that in the last five fiscal years for which figures were available the amounts appropriated, and the percentage of total revenues these amounts represent, were as follows:
 1971-72 1972-73 1973-74
 ----------- ------------ -----------
Amount Appropriated $76,200,000 $82,694,000 $87,106,895
% of Total Revenues 34.9% 33.8% 33.5%
 1974-75 1975-76
 ----------- ------------
Amount Appropriated $94,087,520 $102,685,610
% of Total Revenues 32.4% 31.2%
 
 
 [4]
 See also Klain v. Pennsylvania State Univ., 434 F.Supp. 571 (M.D.Pa.1977)
 
 
 [5]
 Gunther, The Supreme Court, 1971 Term Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 8 (1972)
 
 
 [6]
 E.g., Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 95 L.Ed. 249 (1948) (ancestry)
 
 
 [7]
 Although familiarly known as the two-tier test, the Supreme Court has recognized another test, not applicable here, for gender cases. "(C) lassifications by gender must serve important governmental objectives and must be substantially related to the achievement of those objectives." Califano v. Goldfarb, 430 U.S. 199, 210-11, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (plurality opinion), quoting Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Justice Marshall suggests that the Court applies a more sophisticated test in equal protection cases. "The substantiality of the interests we have required a State to demonstrate in support of a challenged classification has varied with the character of the classification and the importance of the individual interests at stake." Hollenbaugh v. Carnegie Free Library, --- U.S. ----, 99 S.Ct. 734, 58 L.Ed.2d 713 (1978) (opinion sur denial of petition for certiorari, Marshall, J.)
 
 
 [8]
 No contention of a suspect classification has been advanced
 
 
 [9]
 See 7 U.S.C. § 304 for the Land Grant Act and 24 P.S. § 2575 for Pennsylvania's acceptance of it. See also 24 P.S. §§ 2578-79, 2581-84 for Pennsylvania's response to similar legislation granting benefits to and supporting programs at colleges for the agricultural and mechanic arts. The University has been designated by the state legislature as the recipient institution