John F. MURPHY

v.

VILLANOVA UNIVERSITY.

Civ. A. No. 80–4581.

United States District Court, E. D. Pennsylvania.

Sept. 2, 1982.

John F. Murphy, pro se.

Raymond T. Cullen, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

John Murphy graduated from the Villanova University School of Law in the spring of 1981. In the fall of 1980, during the first semester of his final year of law school, Mr. Murphy brought this 42 U.S.C. § 1983 action *pro se* against Villanova and two of its employees.[1] Mr. Murphy's complaint alleges that defendants, having determined that Mr. Murphy's eligibility for employment under the federally funded College Work-Study Program had run out (a determination not challenged in the complaint) wrongfully terminated his employment with the University in contravention of rights asserted under federal law.

A protracted period of discovery ensued, and defendants moved for summary judgment, contending (1) that plaintiff's § 1983 claim must fail because the undisputed facts reveal that defendants' conduct was not tantamount to state action, and (2) that, as a matter of law, the federal College Work-Study statute, 42 U.S.C. § 2751 *et seq.*, under which plaintiff also claims to proceed, creates no private cause of action.

1. The two individual defendants are Vincent Femia, Director of Financial Aid at Villanova, and Ann Keisler, the Coordinator of Villanova's College Work-Study Program.

## I.

The undisputed facts are these. Villanova is a private university incorporated under Pennsylvania law in 1848. The University's Board of Trustees is a self-selecting body. None of its members is chosen by public officials. Since its inception, Villanova has had what its by-laws term "a special relationship" to the Order of Saint Augustine, Province of Saint Thomas of Villanova, and the by-laws provide that "no less than one-third plus one" of the members of the Board of Trustees shall be members of that Order. By-laws of the Board of Trustees of Villanova University In the State of Pennsylvania (Exhibit B, Memorandum in Support of Defendants' Motion for Summary Judgment).

During the fiscal year ending May 31, 1981, the University had expenditures of $45,386,000; during the same fiscal year it had revenues from the Commonwealth of Pennsylvania in the total amount of $494,-000.[2] In other words, the Commonwealth's funds received by Villanova constituted about 1.1% of its budget. During the 1981 fiscal year Villanova received no other grant of property or services from the Commonwealth. The University leases no property from the Commonwealth, nor has the Commonwealth undertaken to provide any form of financial assistance to Villanova for capital development.

Mr. Murphy's dispute with Villanova arises from his dealings with the University's Financial Aid Office. Pursuant to annual contracts between the University and the Pennsylvania Higher Education Assistance Agency ("PHEAA"), and between the University and the federal Secretary of Education ("the Secretary"), the Financial Aid Office administers a number of student financial assistance programs which are funded by state and federal monies.[3]

For the academic year 1980–81, Mr. Murphy received financial aid from two such programs, the state Guaranteed Student Loan Program and the College Work-Study Program (CWSP).

### A.

The function of the Financial Aid Office in implementing the Guaranteed Student Loan Program is merely to certify students' eligibility for guaranteed loans according to the controlling state and federal regulations.[4] Such loans are then guaranteed by PHEAA which in turn is reimbursed by the Secretary for any insurance claims it pays out to lenders.

Administering the CWSP,[5] is a considerably more demanding responsibility. Under the work-study program institutions of higher education receive federal funds which enable them to provide students with part-time work opportunities. The federal government pays 80% of the student's wages; the student's employer (here, the University), pays the remaining 20%. The

2. The Commonwealth's payment of this sum was made pursuant to the Institutional Assistance Grants Act, 24 P.S. § 5181 *et seq.* The sum reflected a payment of $400 per student for each student of the University who received a grant pursuant to one of three state scholarship programs created by the following statutes: 24 P.S. § 5151 *et seq.* ("An Act providing scholarships and ... funds to secure Federal funds for qualified students of the Commonwealth ... who need financial assistance to attend ... institutions of higher learning"); 24 P.S. § 5171 *et seq.* ("Veteran's Education Act of 1971").

3. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Exhibit "A," "Agreement Covering Institutional Participation In Programs of Student Financial Assistance"; and Exhibit "C," "Agreement Between Villanova University and the Pennsylvania Higher Education Assistance Agency."

4. *See* 22 Pa.Code § 121.61 *et seq.*, authority: 24 P.S. §§ 5102, 5104 (1980); 45 C.F.R. Part 177 (1980), authority: Title IV, Part B of the Higher Education Act of 1965, as amended.

5. The College Work-Study Program was created as part of the Economic Opportunity Act of 1964, Title I, Parts C and D, Pub.L. 88–452. Congress transferred responsibility for the program from the Office of Economic Opportunity to the Commissioner of Education with the passage of the Higher Education Act of 1965, Title IV, Part C, Pub.L. 89–329. The statutory provisions which govern the program were amended in 1976 and again in 1980. *See* 42 U.S.C.A. § 2751 *et seq.*

annual agreements between an institution and the Secretary of Education (formerly the Commissioner of Education) require the institution to comply with the provisions of the Act and the regulations promulgated under it.[6] The Act and regulations set guidelines for determining student eligibility, including, *inter alia,* financial need; they also set limits upon the amount of assistance a student may receive under the program. Within those guidelines and limits the university decides which students to hire for what jobs and the amount of work-study funds allocated to each individual student's employment.

CWSP also provides for federal funding of "off-campus" student employment in federal, state or local government agencies and in private, non-profit community organizations. During the period embraced by this suit, off-campus jobs were made available to Villanova students by PHEAA pursuant to an agreement between PHEAA and Villanova. The University referred students eligible for work-study assistance to PHEAA which undertook to find them appropriate employment. PHEAA also contributed state funding to pay for 30% of the students' wages at these off-campus jobs. The University paid the remainder of the students' wages using federal CWSP funds. *See* Plaintiff's Memorandum, Exhibit "C", Agreement between Villanova University and PHEAA dated August 18, 1980.

### B.

In March, 1980 Mr. Murphy applied to the Financial Aid Office for assistance for the 1980–81 school year. The office determined that Mr. Murphy's financial need for the year was $7,500. The office awarded Mr. Murphy a net grant of $2,500 in work-study funds and it authorized him to participate in the state (PHEAA) Guaranteed Student Loan Program. Mr. Murphy then applied for, and, in September, 1980, received, a $5,000 guaranteed student loan.

In the summer of 1980, plaintiff secured, via PHEAA, a work-study job off-campus in the United States Bankruptcy Court for the Eastern District of Pennsylvania. In the course of the summer, plaintiff earned the bulk of his work-study grant; about $500 remained of the grant when plaintiff left his job at the Bankruptcy Court in mid-August.

In late August, 1980, Mr. Murphy met with Arnold B. Cohen, Professor of Law at Villanova Law School. The two discussed Professor Cohen's then current project of writing a treatise on the Bankruptcy Act of 1978. Mr. Murphy offered to serve as Professor Cohen's research assistant for that project, and Professor Cohen accepted plaintiff's offer and informed the Financial Aid Office that he had hired Mr. Murphy as a work-study student employee.

Mr. Murphy began working for Professor Cohen in early September, and for the next several weeks he worked fifteen hours per week as the professor's assistant. During this period, Mr. Murphy told Professor Cohen that his work-study grant would soon be exhausted; Professor Cohen assured Mr. Murphy that he would continue to employ him, paying Mr. Murphy out of non-work-study University funds which the professor had authority to use for the purpose of paying research assistants.

On November 6, 1980, defendant Ann Keisler, the Financial Aid Office's CWSP Coordinator, sent a memorandum to plaintiff informing him that his CWSP funds were dwindling and that once his "authorized eligibility under the federal College Work-Study Program" was used up he would not be permitted "to continue employment on CWSP," nor would he be "permitted to transfer to wage payroll [i.e., payment by general University funds] without written permission from the Financial Aid Office." "Interoffice Memorandum from Ann S. Keisler to John Murphy" appended to Plaintiff's Complaint. Prompted by this memorandum, plaintiff telephoned

---

**6.** The regulations governing the CWSP during the period embraced by Mr. Murphy's complaint are found at 45 CFR § 175.1 *et seq.,* revised as of October 1, 1980; source: 44 FR 47477, Aug. 13, 1979.

Ms. Keisler to request permission to transfer to wage payroll. Ms. Keisler informed plaintiff that he would not be permitted to do so, because if the University did continue to pay him out of its own funds, then he would be receiving monies in excess of the Financial Aid Office's determination of his financial need. Such a state of affairs would be an "overawarded situation" in violation of "the federal regs." Deposition of John F. Murphy dated February 27, 1981 at 68. Plaintiff, on several occasions, requested defendant Keisler to reconsider her position; he enlisted Professor Cohen who informed Ms. Keisler that he did indeed wish to have Mr. Murphy continue to work as his research assistant. However, Ms. Keisler hewed to her original position that the Financial Aid Office would not approve plaintiff's transfer to the University payroll, because to do so would violate the federal regulations governing the Work-Study Program. Plaintiff thereupon filed this suit,

alleging that Ms. Keisler, Mr. Femia, the Director of Financial Aid at Villanova, and the University, acting under color of state law, had violated his federal rights under the CWSP statute and the regulations implementing that statute.

## II.

On the basis of the foregoing facts, defendants are entitled to summary judgment on plaintiff's two federal claims.

### A. The § 1983 Claim

The Supreme Court has recently affirmed that Section 1983 encompasses claims based on purely statutory violations of federal law.[7] *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). However, every claim based on Section 1983, whether grounded in an alleged constitutional or purely statutory violation, must meet that section's "state action" requirement.[8] *Bra-*

---

7. The statutory provisions on which plaintiff relies are 42 U.S.C. § 2753(b)(4) and (b)(7):

§ 2753. *Grants for work-study programs—Authority to enter into agreements.*

(a) The Secretary is authorized to enter into agreements with institutions of higher education under which the Secretary will make grants to such institutions to assist in the operation of work-study programs as provided in this part.

*Agreements with institutions of higher education*

(b) An agreement entered into pursuant to this section shall—

\* \* \* \* \* \*

(4) provide that no student in a work-study program under this part shall be required to terminate that employment during a semester (or other regular enrollment period) at the time income derived from any employment (including work-study or nonwork-study or both) is in excess of the determination of the amount of such student's need for that semester under clause (3) of this subsection, but when such excess income equals $200 or more, continued employment under a work-study program shall not be subsidized with funds appropriated under this part;

\* \* \* \* \* \*

(7) include provisions to make employment under such work-study program reasonably available (to the extent of available funds) to all eligible students in the institution in need thereof, and to make equivalent employment offered or arranged by the institution reasonably available (to the extent of

available funds) to all students in the institution who desire such employment;

\* \* \* \* \* \*

42 U.S.C. § 2753

Subsections (b)(4) and (b)(7) are phrased as directives to the Secretary of Education to govern the conditions under which he disburses federal funds. Part II (B), *infra,* of this opinion holds that these provisions do not confer on Mr. Murphy a private right of action against defendants. But this portion of the opinion assumes, *arguendo,* that (b)(4) and (b)(7) state rules of conduct which the defendants may be required to follow and may be charged with violating. *Cf. Maine v. Thiboutot, supra,* 448 U.S. at 6, 100 S.Ct. at 2506 and cases cited therein. Several of the Department of Education regulations interpreting these provisions are framed as directives to recipient institutions such as Villanova. *See e.g.* 45 CFR § 175.14 (1980).

8. A § 1983 plaintiff must show that those whom he seeks to hold liable for deprivation of his federal rights acted "under color of any statute, ordinance, regulation, custom or usage, of any state ..." 42 U.S.C. § 1983. But the Supreme Court has consistently affirmed that the "under color" of law requirement in § 1983 suits is to be treated "as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price,* 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 1157 n.7, 16 L.Ed.2d 267 (1966); *see Lugar v. Edmonson Oil Co., Inc.,* —— U.S. ——, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

*den v. University of Pennsylvania,* 552 F.2d 948, 955 and (3d Cir. 1977) (en banc). In this case the undisputed facts compel the conclusion that defendants' challenged conduct is not "fairly attributable to the state." *Lugar v. Edmonson Oil Co., Inc.,* —— U.S. ——, ——, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982).

The Third Circuit has recognized two modes of demonstrating that actions undertaken by private institutions should be deemed state action. *See Braden v. University of Pittsburgh,* 552 F.2d 948 (3d Cir. 1977) (en banc). The first mode of proving state action by a private institution derives from *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); it hinges on the existence of such pervasive interdependence between the private institution and the state that the two may be said to be joined in a "symbiotic relationship." *Braden, supra,* 552 F.2d at 957. Where such a relationship has been proven then "all of the [private] entity's actions are state actions," and a plaintiff need not show state involvement in the particular challenged activity.[9] *Benner v. Oswald,* 592 F.2d 174, 179 (3d Cir. 1979). Plaintiff Murphy concedes that he is unable to show the kind of state-private relationship required to meet the *Burton* test.[10]

The second mode of establishing state action, and the one on which Mr. Murphy seeks to rely, derives from *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). It requires a showing of a "sufficiently close nexus between the state and the challenged action" so that the action may be "fairly treated as that of the state itself." *Jackson, supra,* 419 U.S. at 351, 95 S.Ct. at 453. Such a nexus may be found only when the state has "participated in the challenged conduct by 'putting its weight' behind the challenged activity." *Fitzgerald v. Mountain Laurel Racing, Inc.,* 607 F.2d 589, 597 (3d Cir. 1979) (quoting *Jackson, supra,* 419 U.S. at 357, 95 S.Ct. at 456).[11] Absent such a nexus, neither thorough-going dependence on government funds nor "extensive [state] regulation" is sufficient for a finding of state action. *See Rendell-Baker v. Kohn, supra,* —— U.S. at ——, 102 S.Ct. at 2768.

In this case plaintiff has come forward neither with evidence nor with the promise of evidence linking the Financial Aid Office's refusal to approve Mr. Murphy's employment via wages paid to him out of University funds with any "encouragement," any rule of conduct, or any other exercise of "coercive power" on the part of the Commonwealth[12] *Blum v. Yaretsky, su-*

---

9. Whether this aspect of *Braden*'s interpretation of the *Burton* test for state action can be reconciled with the Supreme Court's most recent explications of state action doctrine is a hard question, but not one on which this case turns. *See Blum v. Yaretsky,* —— U.S. ——, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell-Baker v. Kohn,* —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

10. Plaintiff's concession is surely warranted. The record reveals that Villanova bears none of the several "indicia of a close relationship between the state and the university" on which the *Braden* court relied in concluding that sufficient facts had been produced in the court below "to undergird an eventual finding that there is a symbiotic relationship between the state and Pitt." 552 F.2d at 964–5. Rather, Villanova plainly belongs in the category of "private universities which receive limited state benefits." *Id.* at 964 n.79. If state action is to be attributed to such an institution, it must be by application of the " 'close nexus' approach," *id.* at 965, discussed hereafter.

11. *See also Blum v. Yaretsky, supra,* —— U.S. at ——, 102 S.Ct. at 2785 ("[A] state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state.")

12. Rather, Mr. Murphy contends that he can make out a "close nexus" between the Financial Aid Office and the state by pointing to (a) the infusion of state funds, via PHEAA, into the University's Off-Campus Work-Study Program; (b) the annual contracts between PHEAA and Villanova which circumscribe the University's conduct vis-a-vis the off-campus component of its Work-Study Program; and (c) PHEAA's involvement in the financing and administration of the State Guaranteed Student Loan Program, and particularly its contribution to the Financial Aid Office's costs in performing Villanova's role in administering the loan program. But state funding and extensive state regulation of these separate domains of the Financial Aid Office's activities cannot substitute for a

pra, —— U.S. at ——, 102 S.Ct. at 2785. By plaintiff's own account, Ms. Keisler's refusal to permit him to be paid for his work for Professor Cohen out of University funds was prompted solely by defendants' "misconceptions of the Work-Study statute and regulations." Plaintiff's Memorandum In Opposition to Defendants' Motion for Summary Judgment at 4; Plaintiff's Pre-trial Memorandum at 5. The record confirms that no state contract or regulation "compelled or even influenced" the challenged conduct, *Rendell-Baker v. Kohn,* —— U.S., *supra,* at ——, 102 S.Ct. at 2768, and Mr. Murphy does not contend otherwise. In short, plaintiff has failed to show that a genuine factual dispute exists in this case with respect to the "under color" of law requirement of § 1983, and defendants are, therefore, entitled to summary judgment on that count of Mr. Murphy's complaint.

B. *Does the Federal College and Work-Study Program Statute Confer on Plaintiff An Implied Private Cause of Action?*

■ In addition to asserting a § 1983 claim, Mr. Murphy contends that the federal College Work-Study Program statute, 42 U.S.C. § 2751 *et seq.,* confers on him an implied cause of action against defendants. No cases have been uncovered addressing the issue whether an implied cause of action exists under this statute. However, the Supreme Court has, in a series of recent cases, developed and refined the implied cause of action analysis first set out in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), and these opinions may guide our inquiry in this case.

Last year in *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 1778–79, 68 L.Ed.2d 101 (1981), the Court reiterated that the *Cort v. Ash* analysis represents a "preferred approach for determining whether a private right of action should be

implied from a federal statute," *id.* at 1778, and quoted from *Cort* the "four factors thought to be relevant to the inquiry:"

"First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U.S., at 78, 95 S.Ct., at 2087 (citations omitted).

These factors comprise the criteria for resolving "the ultimate issue ... whether Congress intended to create a private right of action." *California v. Sierra Club, supra,* at 1779; *see also Universities Research Assn. v. Coutu,* 450 U.S. 754, 764, 101 S.Ct. 1451, 1458, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 23–24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 575–76, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). The post-*Cort v. Ash* decisions of the Supreme Court "teach that the third and fourth factors are relevant only if the first two suggest that Congress intended to create a remedy." *Patentas v. United States of America,* 687 F.2d 707 at 711 (3d Cir. 1982) (citations omitted).

There can be little doubt that plaintiff satisfies the first criterion of the *Cort v. Ash* test; he is a member of the class of students whom Congress intended to benefit by enacting the work-study program.[13] But "whether Congress intended additionally that these provisions would be enforced

showing of direct state involvement "in the specific conduct which is being challenged." *Braden, supra,* at 973 (Garth, J., concurring).

**13.** *See* 42 U.S.C. § 2751(a):

(a) The purpose of this part is to stimulate and promote the part-time employment of students, particularly students who are in need of earnings from employment to pursue courses of study at eligible institutions.

through private litigation is a different question." *Transamerica Mortgage Advisors, supra,* 444 U.S. at 18, 100 S.Ct. at 246. Answering that question requires that we attend, first of all, to "the language of the Act itself." *See Coutu, supra,* S.Ct., at 1461; *see also Transamerica,* 444 U.S. at 16, 100 S.Ct. at 245; *Touche, Ross, supra,* 442 U.S. at 568, 99 S.Ct. at 2485.

In cases "where the language of the statute explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff," *Cannon v. University of Chicago,* 441 U.S. 677, 690 n.13, 99 S.Ct. 1946, 1954 n.13, 60 L.Ed.2d 560 (1979), the Court consistently has concluded that Congress intended to create a private cause of action. Conversely, the Court has reasoned that there is "far less reason to infer a private remedy in favor of individual persons" in cases where Congress, "rather than drafting the legislation 'with an unmistakable focus on the benefited class,' instead has framed the statute simply as a general prohibition or command to a federal agency." *Coutu, supra,* 101 S.Ct., at 1462, quoting *Cannon,* 441 U.S., at 691, 99 S.Ct., at 1955.

Section 2753(b) of Title 42, which contains the two subsections, (b)(4) and (b)(7), quoted *supra* at note 7, upon which plaintiff relies, requires that certain provisions be placed in grant agreements between the Secretary of Education and educational institutions. Thus, section 2753(b) is like section 1 of the Davis-Bacon Act which the Court construed in *Coutu;* it is phrased simply "as a directive to [a] federal agenc[y] engaged in the disbursement of public funds." *Coutu,* 101 S.Ct. at 1462.

The right-creating, or duty-creating, language of section 2753(b) does not focus on the benefited class. Instead, "the duty created by the statutory language" is imposed on the Secretary "to ensure that certain provisions are included" in federal grant agreements. *Id.* at 1462 n.23. The statutory language, then, "provides no support for the implication of a private remedy." *Id.* at 1462.

In addition to scrutinizing the particular statutory language at issue in implied right of action cases, the Court has looked to the architecture of the entire statute in assessing whether Congress envisioned private enforcement of its provisions. In so doing, the Court has repeatedly warned that "where a statute expressly provides" enforcement mechanisms, "a court must be chary of reading others into it." *Transamerica,* 444 U.S., at 19, 100 S.Ct. at 246; *see also Middlesex Cty. Sewerage Auth. v. Nat. Sea Clammers,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981). Title IV of the Higher Education Act contains the statutory provisions which govern the work-study program as well as federal student grant and loan programs. Title IV includes enforcement provisions authorizing the Secretary of Education to prescribe regulations providing for "the limitation, suspension or termination" of an institution's eligibility for work-study program funds if the Secretary determines that the institution "has violated ... any provision of ... or any regulation prescribed under ... part C of Subchapter I of chapter 34 of Title 42 [42 U.S.C. §§ 2751–2756(b), the CWSP]." 20 U.S.C. § 1094(b)(1)(D).[14] In addition, the Secretary is authorized to impose civil

---

**14.** Among the regulations promulgated pursuant to this statutory authority by the then Commissioner of Education were ones which created "informal compliance procedures." See 45 CFR § 168.73 (1980) for the incarnation of these procedures which existed at the time Mr. Murphy's dispute with defendants arose. § 168.73(a) provides:

    (a) If the Commissioner receives a complaint, or has other information which the Commission believes to be reliable, indicating that an institution is, or may be, in violation

of applicable laws, regulations, special arrangements, agreements, or limitations, the Commissioner may call the matter to the attention of the institution and may give it a reasonable opportunity—

    (1) To respond to the complaint or other information;

    (2) To show that the matter has been corrected; or

    (3) To submit an acceptable plan to correct the violation and prevent its recurrence. 45 CFR § 168.73(a) (1980).

penalties for such violations. 20 U.S.C. § 1094(b)(2)(B)(i).[15]

The inclusion of these enforcement provisions in the Higher Education Act strongly supports the view that when Congress added § 2753(b)(4) and (b)(7) to the CWSP provisions of the Act in 1976—and framed them as mandates to the then Commissioner of Education in the disbursing of grants—Congress intended that these provisions would be enforced by the Commissioner through the mechanisms it was also then creating[16] and not others. This inference finds corroboration in the fact that in 1980 Congress again turned its attention to the enforcement of the provisions governing the CWSP and again failed to provide for any private right of action but chose rather to strengthen the Secretary's enforcement artillery.[17]

To conclude instead that Congress wished to see the enforcement scheme it fashioned supplemented by damage suits brought by students would in effect be to fashion an individual right to private employment assertable against any institution which receives CWSP funds. Nothing in the legislation's scheme or its history remotely suggests that Congress desired such a result.

Accordingly, defendants are entitled to summary judgment on the second of plaintiff's two federal counts.

## III.

In addition to his two federal claims, Mr. Murphy also asserts two causes of action grounded in state law.[18] The first of these alleges that Mr. Murphy is entitled to monetary damages as a third-party beneficiary of the funding agreement between Villanova and the federal Secretary of Education.[19] Plaintiff's second state law claim alleges a common law conspiracy on the part of defendants Keisler and Femia and other University employees to deprive plaintiff of employment in violation of 42 U.S.C. § 2753(b)(7).[20] Plaintiff contends that these two state law claims are properly before me under both pendent and federal question jurisdiction, 28 U.S.C. § 1331(a).

Plaintiff's reliance on the doctrine of pendent jurisdiction fails in light of the adverse disposition of his two federal claims. *See*

---

15. Before 1976, the Commissioner of Education had authority under the Guaranteed Student Loan Program to impose sanctions upon institutions which violated the provisions and regulations governing that program. Congress extended this authority to apply to the work-study program in 1976. Pub.L. 94–482, Title IV, § 497A. The Education Amendments of 1980 continued this authority, now vested in the Secretary of Education, and also authorized the Secretary to impose civil penalties for statutory and regulatory violations. Pub.L. 96–374, Title IV, Part E § 451(A).

16. See note 15, *supra*.

17. See note 15, *supra*.

18. Mr. Murphy first set out these two state causes of action in his pretrial memorandum and in that memorandum requested leave to amend his complaint to add them as two additional counts. Because the two new counts turned on the same facts as plaintiff's original claims and, therefore, entailed no further discovery, the court granted plaintiff's request at a pretrial conference. *See* Rule 16, F.R.Civ.P. At the same pretrial conference, counsel for defendants sought leave to move for summary judgment. In allowing that request, the court directed defendants to address in their motion for summary judgment plaintiff's two state law claims as well as his two federal counts. Defendants complied with that direction and have moved for summary judgment on the two state law claims. Both sides have fully briefed the question whether these claims can withstand defendants' motion.

19. The provision of that agreement upon which plaintiff relies is one prescribed by 42 U.S.C. § 2753(b)(7), see note 7, *supra,* and tracks the language of that subsection of the CWSP statute. The provision reads:

> 6. The Institution agrees that employment under the College Work-Study Program will be made reasonably available (to the extent of the available funds) to all eligible students in the Institution in need thereof, and that equivalent employment offered or arranged by the Institution will be made reasonably available (to the extent of available funds) to all students in the Institution who desire employment.

Exhibit "A" to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, Article VIII, Section 6.

20. 42 U.S.C. § 2753(b)(7) is set out in note 7, *supra.*

*United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 195–96 (3d Cir. 1976). There remains, then, the necessity of deciding whether either of Mr. Murphy's asserted state causes of action present federal questions.

A. *Plaintiff's Third-Party Beneficiary Claim*

First to be considered is plaintiff's third-party beneficiary theory. The mere fact "that a contract is subject to federal regulation does not, in itself, demonstrate that Congress meant that all aspects of its performance or nonperformance are to be governed by" federal, rather than state, law. *Lindy v. Lynn,* 501 F.2d 1367, 1369 (3d Cir. 1974). However, a contract claim may present a federal question if "a distinctive policy of a federal statute requires the application of federal law to determine [the] operation and effect" of a contract's provisions. *Id.* at 1369.

▮▮▮ Plaintiff's third-party beneficiary claim against Villanova falls into that category of state law contract claims which present federal questions, but this conclusion affords plaintiff small comfort. For a plaintiff to recover on a third-party beneficiary claim in Pennsylvania he must show that both parties to the contract intended to create potential liability on the part of the defendant-promisor toward the plaintiff. *Spires v. Hanover Fire Ins. Co.,* 364 Pa. 52, 56–7, 70 A.2d 828 (1950). The contractual provision on which plaintiff seeks to ground Villanova's liability is, as noted above, one which Congress prescribed for inclusion in all CWSP grant agreements and which tracks the language of § 2753(b)(7). In contending for a third-party beneficiary claim against Villanova based on this particular contractual language, plaintiff has merely reclothed in a common law outfit his federal implied cause of action claim relying on § 2753(b)(7). But Part II(B) of this opinion has already determined that Congress, in adding § 2753(b)(7) to the provisions of the CWSP statute, did not intend to

confer on the statute's student beneficiaries a private right of action, envisioning instead that § 2753(b)(7)'s mandate to recipient institutions such as Villanova would be enforced by the Secretary. This "distinctive policy of a federal statute requires the application of federal law" in disposing of plaintiff's contract claim. *See Lindy v. Lynn, supra,* 501 F.2d, at 1369.

The particular question of contract interpretation to be resolved by federal law is this: By agreeing to make employment equivalent to work-study employment "reasonably available ... to all students ... who desire employment," did Villanova "intentionally assume" the liability to third-party student beneficiaries for which plaintiff contends? *See Spires v. Hanover Fire Ins. Co., supra,* 364 Pa. at 56–7, 70 A.2d 828. Since the Secretary exacted this promise from Villanova at Congress's behest, and since Congress did not intend to create a statutory right of action on plaintiff's behalf, it would be anomalous indeed to construe the promise as one which the Secretary—or, *a fortiori,* Villanova—intended or understood as imposing on the University potential contract liability for such claims as Mr. Murphy now brings.

Wherefore, defendant Villanova is entitled to summary judgment on plaintiff's contract claim.

B. *Plaintiff's Civil Conspiracy Claim*

▮▮ The final matters for consideration are plaintiff's civil conspiracy claim and the threshold determination whether that claim, grounded in Pennsylvania common law, presents a federal question.

A "properly pleaded 'state-created' claim" presents a federal question if its disposition requires that "an act of Congress must be construed." *Warrington Sewer Company v. Tracy,* 463 F.2d 771, 772 (3d Cir. 1972) (citations omitted). Mr. Murphy contends that his civil conspiracy count against defendants Keisler and Femia is such a claim. "A civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Landau v.*

*Western Penna. National Bank,* 445 Pa. 217, 224, 282 A.2d 335 (1971). Plaintiff alleges that Ms. Keisler and Mr. Femia conspired to deprive him of employment in violation of 42 U.S.C. § 2753(b)(7).[21] In order to dispose of this claim, so plaintiff argues, a judicial construction of § 2753(b)(7) is required, because unless defendants' refusal to pay plaintiff out of University funds violated that subsection of the CWSP statute, there was no combination "to do an unlawful ... act."

Contrary to plaintiff's view of the matter, it is unnecessary to construe § 2753(b)(7), for the reason that, far from being a "properly pleaded 'state-created' claim,"[22] Mr. Murphy's civil conspiracy charge is one that is fatally flawed on purely state law grounds. Under Pennsylvania law "malice, *i.e.,* an intent to injure" is an essential element of a civil conspiracy claim. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (1979) (citing cases). Plaintiff's own factual averments establish that this essential element is irremediably absent from his count for civil conspiracy.[23]

In light of this state law infirmity in plaintiff's "state-created" civil conspiracy claim, it is apparent that the claim is not one which presents "a pivotal question of federal law." *Warrington, supra,* at 772. It is, therefore, not a claim over which this court has jurisdiction. *Id.*

### Conclusion

For the foregoing reasons, an order was filed on April 1, 1982 disposing of this matter in favor of defendants.

---

**21.** *See* note 7, *supra.*

**22.** *Warrington Sewer Co. v. Tracy, supra,* 463 F.2d, at 772.

**23.** "The sole reason for [defendants' allegedly unlawful conduct] was because defendants thought it was required by federal law." Plaintiff's Pretrial Memorandum at 5.